**GEORESEARCH, INC.**
v.
**Herbert A. MORRISS, Jr.**

**GEORESEARCH, INC.**
v.
**George C. HOWARD.**
**Civ. A. Nos. 6826, 6827.**

United States District Court
W. D. Louisiana,
Shreveport Division.

March 30, 1961.

**164**

Timothy E. Kelley and Talbot Rain, Thompson, Knight, Wright & Simmons, Dallas, Tex., L. W. Richey, Gaharan & Richey, Jena, La., for plaintiff.

John T. Guyton and James A. Van Hook, Hargrove, Guyton & Van Hook, Shreveport, La., for defendants.

BEN C. DAWKINS, Jr., Chief Judge.

Brought under the Diversity Statute,[1] these two cases were consolidated for trial with separate judgments to be rendered. The question in both cases turns on the validity and interpretation of two identical written agreements signed by defendants, entitled "Stock Transfer Restriction Agreement," hereinafter referred to as the Agreement.

The Agreement, restricting defendants' rights to sell, transfer or otherwise dispose of certain shares of stock in the plaintiff corporation, was executed on November 9, 1955, and was to terminate on September 1, 1957, or upon the happening of any of several events, with which we are not here concerned. On July 13, 1957, further identical agreements were signed by defendants which extended the termination of the Agreement to March 1, 1958. Defendants were discharged on October 22, 1957, from their positions as president and vice-president of the corporation, and these suits were filed on March 17, 1958.

The Agreement provides that upon the "termination of employment" of the defendants, the corporation would have the right to purchase from defendants one half of their shares of stock in the corporation at the option price of $ .07 a share. Termination of employment is defined in the Agreement to be:

"  *   *   * the cessation of the Officer to be an officer or employee of the Company because of voluntary resignation or retirement, or be-

---

1. 28 U.S.C.A. § 1332. Plaintiff is incorporated under the laws of Delaware and defendants are citizens of Louisiana.

cause of his removal or discharge for cause, except that such term shall not include temporary leave from employment granted by the Board of Directors of the Company by reason of consecutive illness at any one time in excess of six months; provided, however, that if the salary paid to the Officer is so reduced that it is no longer a reasonable salary commensurate with the services the Officer is called upon to perform, taking into account the financial condition of the Company, then the Officer may voluntarily resign and his resignation under such circumstances shall not be deemed to be a 'termination of employment' as that term is used herein."

Each complaint alleges that the respective defendant was discharged for cause, within the meaning of the Agreement, and has refused to accept the tender of $ .07 a share for one half of the total shares owned by him following written notice of the corporation's exercise of its option. Plaintiff originally prayed for damages on account of defendants' refusal to comply, and in the alternative that the defendants be required to transfer the shares to the plaintiff. At the trial, however, it was stipulated that if judgment is rendered for plaintiff it should not be for monetary damages but that Morriss and Howard be required to tender 13,505 and 13,497 shares, respectively, at the option price.

Morriss and Howard received college degrees in engineering and, prior to the organization of Georesearch, both were employed by large corporations in various phases of the oil industry. In 1952, these two men conceived a plan whereby they hoped to establish that a small company could explore for oil and gas, with the same proficiency as a major company, through use of a team of geologists and geophysicists employed as a seismic crew. This *modus operandi* was experimental at that time in the oil industry, but defendants believed they could effectively employ it to find undiscovered reserves in areas such as East Texas and North Lou-

isiana, which had previously been rather thoroughly explored.

Morriss was president and Howard vice-president of the new corporation which was then formed to effectuate their idea. Both defendants owned 500 shares each of Class A voting stock at $1 a share. In addition, Morriss owned 1,134 shares of Class B non-voting stock at $1 a share, and Howard owned 1,133 shares of the same stock. Morriss succeeded in convincing Texas Eastern Transmission Company of the feasibility of their plan, and Georesearch, Inc., became a subsidiary of Texas Eastern which owned the remaining 5,000 shares of Class A stock. Other employees of Georesearch, Inc., owned the remaining Class B stock, which together with defendants' stock totaled 4,000 shares.

During the next three years, Georesearch operated under a contract with Texas Eastern surveying the parent company's rights-of-way in search of oil. Its entire source of income was derived from Texas Eastern, who expended approximately $690,000 for the scientific data compiled by Georesearch. A considerable number of oil prospects were developed during this time, with little or no drilling. The purpose of the company was to develop and turn over to Texas Eastern any favorable oil prospects which then would be drilled by another subsidiary corporation.

When, at the end of the three-year contract (July 31, 1955), Texas Eastern decided to terminate the services of Georesearch, Morriss and Howard realized that additional capital was needed to finance their operation and to support the cost of drilling and leasing of land. For that purpose Morriss held a brief discussion with John Crichton, a successful independent oil man. After a trip to New York, where he talked to others for the same purpose, Morriss again discussed the matter with Crichton, who attempted to work out some sort of operating agreement between Electric Bond and Share, Oil and Gas Property Management, Inc., of which Crichton was president, Empire Trust Co., of which

Crichton was vice-president, and Georesearch. This did not work out so Morriss was again contacted by Crichton with a proposal of recapitalizing Georesearch and merging it with J-O Oil Co., which was then equally owned by Oil and Gas Property Management, on the one hand, and J. F. Justiss and C. G. Mears, on the other. The basis for this proposed merger was that Georesearch had a large number of oil prospects developed over the three-year contract with Texas Eastern, plus a good staff of technicians, but it needed a sizable income on which to operate. J-O Oil Co. would benefit from the oil prospects, could use the large technical staff and had a $20,000-a-month income. The plan was for Georesearch to continue its operations as it had done for Texas Eastern but with the additional purpose of interesting outside venture capital to contribute to the cost of drilling on the prospects that Georesearch had developed, and would develop.

It was also decided that a public offering of stock should be made, and in this connection the New York investment firm of Keith Reed and Company was called in to handle the underwriting.

Mr. George Rooker of Keith Reed was in charge of the underwriting arrangements. After examining Georesearch's assets, and those of Justiss-Mears and Oil and Gas Property Management, Inc., in the J-O Oil Co., it was decided that Justiss-Mears and Oil and Gas Property Management would transfer their holdings to Georesearch in exchange for: (1) Oil and Gas receiving $200,000 and 2,000 shares of Class A common stock which Georesearch would reacquire from Texas Eastern; (2) Justiss and Mears each receiving $100,000 and 1,000 shares of Class A common stock to be reacquired from Texas Eastern. It was also agreed that 750,000 shares of $1 par value common stock would be issued. All Class A and Class B common stock would be converted to one class of common stock at the ratio of 20 shares of new $1 par value stock for each share of the Class A stock and 15 shares of the new stock for each share of the Class B stock held in Georesearch. The remaining shares were to be sold to the public.

The result of this transaction, insofar as defendants were concerned, was that they each would receive 10,000 shares of $1 par value common stock in exchange for 500 shares of Class A stock they then owned in Georesearch. In addition, Morriss would receive 17,010 new shares for his 1,134 Class B shares, and Howard would receive 16,995 new shares for his 1,133 Class B shares.

Totally, the defendants received 54,005 shares of stock at par value of $1 a share, in exchange for stock which cost them $3,267. If sold on the open market at that time, the newly-acquired shares would have brought $149,531.95.

Rooker initially raised the question of restricting the stock owned by Morriss and Howard. His first proposal was that one half of the stock to be transferred to defendants would be presented to them outright at the time of reorganization. The other one half would be placed in a voting trust and distributed to defendants at the end of two years or at any time prior thereto, at the option of the trustees. This plan was rejected and the final agreement vested the whole of the allocated stock in defendants with an option granted to the corporation to repurchase one half of it under certain conditions.

As stated, the moving party insofar as the restriction agreement was concerned was the underwriting group. Their first proposal, after agreeing that the whole of the allocated stock would be vested in the defendants, defined "termination of employment" as the cessation of defendants serving as officers because of "death, resignation, retirement, removal, discharge, or for any other reason whatsoever * * *." Morriss' attorney counterproposed a draft which defined "termination of employment" to include "just cause" which was further defined to be (a) dishonesty on Morriss' part, (b) failure of Morriss to exercise reasonable skill and competency in the discharge of his duties, and (c) illness of Morriss re-

quiring his absence from work in excess of —— days.

The final draft agreed upon defines "termination of employment" as being, in part, "discharge for cause."

Rooker's reason for requesting the Agreement, as stated at the trial, was that:

"When the thing was first mentioned to me, I felt that the amount of promotion stock being issued to Mr. Howard and Mr. Morriss and his group was out of line in respect to the other contribution being made and the price and amount of stock to be offered to the public, and I felt there had been some discussion about an equal arrangement between the J-O people and the original Georesearch people, and I felt, at least, as a partial protection to the public stockholders that there ought to be an option given to the company to purchase back part of this stock if the information and if the people involved didn't prove out as expected, since it was very intangible as far as their contribution was concerned."

Defendants have attempted to counter this testimony with two letters written by Rooker to Morriss, in support of their contention that the Agreement was necessary to insure that the defendants remained with the company and would not unload their stock on the open market. This, they contend, furnished the necessary "window dressing" to the public sale of stock.

The first letter by Rooker, dated July 29, 1955, (Exhibit D–13), which outlined the voting trust arrangement, stated that:

"The following is a recap of our telephone discussion of this morning in regard to the restrictions which we would like to see on the options and stock. As I pointed out to you, it is felt that these concessions on your part are not actually taking anything from you, but will give the deal a better appearance in so far as the public is concerned. Believe me, our only motive in suggesting these restrictions is to improve the appearance of the deal in the public's eyes. We both recognize, I am sure, that a successful and well accepted public offer is very essential to this deal."

Further:

"As I pointed out to you so far as we are concerned, it is essential that the above be entirely acceptable to you, and we want you to feel that the deal, as finally negotiated, has been made with the best interests of all concerned in mind. Frankly, we believe that these are not undue requests. Obviously, if the present management continues with the Company for a period of two years, the difference in status of their stock and options will not vary one iota or one share from the original discussions, and yet the public will be given complete assurance of the management's good faith and intentions by these simple restrictions."

The second letter, dated August 1, 1955 (Exhibit D–14), stated that:

"The purpose of the stock restriction was the same as with the options, that is to tie the management more securely to the corporation. I meant to say that the ½ stock to be held in the voting trust would be deliverable to the management at the end of two years if the management were still in the employment of the Corporation."

Defendants managed Georesearch, Inc., from January, 1956, to October, 1957. During this twenty-two month period the company drilled twelve wells. Seven were wildcats resulting in no production. The other five were field extensions of which two were producers. Only one of the latter wells resulted in a profit to the company. Seven of the twelve wells were on prospects developed by Georesearch. Three of these seven were drilled on one prospect. Howard testified that at the time of his discharge

he intended to develop seven or eight other "closures" into drilling prospects. The principal technique employed by Georesearch was to mount seismic equipment on Oliver Farm Wagons which would permit the crews to travel across farm lands previously denied by the owners to crews in heavy trucks. Howard also testified that between $100,000 and $125,000 was spent to finance the seismic operations.

Morriss was the president of Georesearch and had general supervision over all of its operations. He testified that his responsibility was to carry out the plans and policies outlined by the Board. He also admitted that he had the responsibility of making recommendations to the Board, and that he and Howard were in control of all the various elements required for successful selling of oil prospects to potential investors. Howard was responsible for several areas of operation. He had general supervision of all personnel and general supervision of the office work. He was also treasurer of the company with general supervision of accounting and company financial records. He was in charge of the exploration program, evaluated all "deals submitted to the company," supervised the leasing and land work, and directly supervised and directed the field crews in seismic work. He presented the data on prospects to the operating committee or Board of Directors, and attempted to sell interests in the oil prospects.

Examining the financial position of Georesearch and its subsidiary, J-O Oil Company during the period in question, it is clear that their operations were financially unsuccessful. Between June 30, 1956, and June 30, 1957, the two companies had a cumulative decrease in cash of $297,855.93, resulting in a cash position of $236,403.39 on the latter date. Working capital decreased during the same period from $623,381.38 to $383,035.04, a drop of $240,346.34, during the year.

For the same period, Georesearch alone had a decrease in working capital from $482,155.30 to $200,450.20, a difference of $281,705.10. Current assets dropped to $256,855.37, a decrease of $231,903.62.

For a two-year period ending June 30, 1957, cumulative cash receipts for Georesearch alone derived from the sale of crude oil production and geological surveys totaled $35,335. The net cash drain attributable to operations, excluding capital outlays, totaled $672,291, and the cumulative cash drain was $636,956.

Defendants' other activities consisted of attempts to obtain drilling funds. Morriss made a trip to New York City prior to the organizational meeting in January, 1956. While there he talked to eight firms who were thought to have money available to invest. Morriss attempted to sell these people on investing in a syndicate type arrangement. This is where the investor has a certain amount of money he wants to invest in exploration for oil. He will make a tentative commitment to the oil operator or drilling company of a certain sum. However, as each prospect is submitted to him, he can either accept or reject it, his actions being based usually on the recommendations of a consultant hired by him to appraise the prospect. Morriss' trip was unsuccessful and at the initial organizational meeting in January, 1956, he was advised by several of the directors that venture capital on a syndicate basis was not then available. The Board adopted a policy of attempting to secure funds on a "deal by deal" basis. This involves participation by outside interests in each individual prospect. The main difference between the deal-by-deal and the syndicate type of arrangement is that the latter involves less trouble to find since the oil operator will already have a person with money available. That person, in effect, will have an option to participate on each prospect developed by the operator.

In this connection, defendants contend that Crichton knew that Morriss and Howard had had no prior experience in raising drilling funds, and that because of his connections, it was Crichton's job to make these financial arrangements.

They argue that when syndicate venture capital was not forthcoming, the Board elected to pursue the deal-by-deal method which was not the type of operation envisioned by the reorganization. Plaintiff counters with the argument that Morriss failed to raise money because he had nothing in the way of good prospects to sell. If he had secured any funds, there is nothing to indicate that this would have insured the success of the company since he spent $700,000 during the next 22 months and accomplished nothing.

During the twenty-two months of their employment, defendants expended a great deal of time and effort in attempting to raise money. Howard concentrated on the deal-by-deal basis, and Morriss in other ways. Morriss also attempted to find suitable properties to purchase. He looked into several possibilities of mergers with other companies that had a backlog of drilling funds. He testified that beginning in January, 1957:

"I did think, at this time, it was necessary to visualize some direct change of our course of action. I was hoping to find a change which would preserve the equity—which was—the risk factors inherent in this particular kind of operation. I would have liked most to have merged with a company that had a backlog of drilling funds to go ahead and exploit our information. I had, also a number of other ideas which I expressed to the Board. At a later date, I summarized these activities for the Board, and I think it was Mr. Crosby that mentioned the possibilities of European capital about that time; the possibility of a joint venture with a gas company which had no producing company; the possibility of the direct merger with a somewhat larger oil company which did have some committed drilling funds available, particularly for application in the Gulf Coast area.

"At any rate, I devoted almost my full time from the 9th of April until October 22nd in an effort to translate the interest of the stockholders to a situation which would preserve the equities which they had."

The circumstances surrounding the signing of the extension agreement on July 13, 1957, by both defendants, are also important.

Having realized, as noted in his testimony, that a change in direction was needed, Morriss devoted his efforts between April, 1957, and October 22, 1957, the date of his discharge, in attempting to work out some sort of merger arrangement. The best possibility was one of merging with Oceanic Oil Company. In June, 1957, Morriss was called to Dallas where he met with Rooker, Crichton and a Mr. McCartney, another director of Georesearch. He was questioned as to the future of the company, the inference being that its large overhead had to be decreased. Morriss disagreed with this idea and described his efforts toward accomplishing a merger with Oceanic. He told these men that if the Board wanted a plan to shrink the company, he hoped the Board would tell him at the next meeting. It was at this next meeting when the Board told him that he had 45 days in which to "do something." It was also at this meeting that the extension agreements were signed.

Morriss was disturbed when the extension agreement was presented to him for his signature. He testified that:

"I did not feel this was a question of earning stock. I thought I had been asked to jeopardize the stock, in the first place, in order to give aid and comfort to the stock brokers. I felt having carried out my part of the deal, there was no particular reason why anyone should have any claim on my stock, or any part of it. I was particularly put out when they proposed I again place that stock in jeopardy when I realized, actually, it was not mine and I had not, at that time, contemplated doing anything, which in my opinion was for cause or would cause me to be dismissed for cause.

"So, I was quite taken aback on the demand placed on me by extend-

ing the stock restriction agreement and so stated to the board in very strong terms; that I felt the board, under the circumstances, had me over the barrel because at that time I was in the act of attempting to negotiate a merger and I realized, or I felt perhaps erroneously, my services were essential to completing this merger; that it would not go through if I were not in the picture; and so I felt that the requirement laid on me by Mr. Crosby—or it was stated by Mr. Crosby—I should be willing to gamble my stock on my success in accomplishing a merger.

"I felt this was a very unfair demand. I felt if the board directed me to sign this, or felt I should sign it and again gamble my stock, that the stakes were good enough—that is, my hopes of making this merger were good enough [to] preserve Georesearch for its stockholders, and I did go ahead and sign it, but I told the board I felt they had me over a barrel, and at this point, Mr. Wheless and Mr. Justiss thought I used too strong a term and I told them that is how I felt about it.

"I gambled it once for the whim of the stockholders, or so it seemed to me, and I didn't want to gamble it again."

Morriss testified that he signed the agreement because he believed that the merger would not be accomplished unless he remained in the picture. He also testified he knew that, if he did not sign, the Board would have dismissed him at that time. However, under cross-examination he stated that the primary purpose of the extension agreement was to keep him from resigning.

Howard testified that he signed the extension agreement in order to permit Morriss to continue with his attempt to merge Georesearch with Oceanic Oil.

Two principal questions are presented here:

(1) Whether the Agreement is valid and enforceable; and,

(2) The proper interpretation of the phrase "discharge for cause."

Defendants have attacked the validity of the Agreement on several grounds. They contend that it is against the public policy of the State of Louisiana, *contra bonos mores*, and unenforceable under Louisiana law. They urge that the obligation to sell one half of their shares at $ .07 a share is excessive, not supported by serious consideration and, in any event, enforceable only if the principal contract of employment had been violated, which, they urge, did not occur. In addition, they argue that the right of the plaintiff corporation to determine what constitutes "cause" is a potestative condition within the meaning of the Louisiana Civil Code, and, if an objective standard is to be applied, no "cause" existed under Louisiana law. Defendants also argue that a Delaware corporation cannot enforce a contract giving it an option to repurchase its own shares of stock when it does not have an earned surplus with which to pay the option price.

Defendants have also asserted that the Agreement was intended only to assure the public stockholders that defendants would remain with the corporation during its critical period of growth. Additionally, they contend, the Board of Directors approved or ratified all of the expenditures and operations of Georesearch and, therefore, defendants should not be blamed for its failure.

Plaintiff argues that the Agreement does not contain an employment contract as its principal obligation and therefore it cannot contain a penalty obligation. As to the meaning of "discharge for cause," plaintiff contends that general incompetency and inability to conduct the affairs of the corporation successfully over an extended period of time is sufficient "cause" to discharge the defendants. In this connection, plaintiff asserts that "discharge for cause" is a relative term depending on the circumstances and nature of the employment. Plaintiff contends that, in addition to the evidence of the financial condition of the corporation, other evidence of incompetency was de-

fendants' failure to reduce their overhead in the face of economic disaster.

Plaintiff further contends that defendants received serious consideration for signing the Agreement in that they received 27,000 shares outright with a market value of almost $75,000, in exchange for 3,267 shares which cost them only $3,267. In addition, they say, the option price of $ .07 a share is almost a cent more per share than the cost of such shares to the defendants. Plaintiff also argues that there was no potestative condition here because the option could not be brought about solely at the will of the corporation.

Finally, plaintiff argues that Delaware law does not prevent a corporation from repurchasing its own shares if there is a surplus, capital or earned, available, from which to pay the purchase price.

Defendants have filed a motion to dismiss for failure to state a claim, which has been referred to the merits. At the same time this motion was filed, defendants filed a counterclaim praying for damages in the amount of the difference between the market value as of October 25, 1957, of one half of their respective shares of stock and the present market value, which damage, they allege, was caused by plaintiff corporation's refusal to allow the defendants to sell their stock to anyone else.

Since trial on the merits, defendants have filed a motion to allow an additional counterclaim in which they allege that they are entitled to the sum of $24,309 plus legal interest thereon from July 9, 1960. This sum represents a dividend, paid in 1960 by the corporation, of $ .90 a share which has been held in trust by the Commercial National Bank in Shreveport. However, defendants allege that the investments made by the trustees with this sum have not produced a rate of interest equal to legal interest of 5%. Accordingly, they pray that they be recognized as owners of this sum held in trust plus legal interest, subject to a credit in the amount of such interest as has been received by the trustees.

After carefully considering all of the facts and circumstances of the case, the voluminous record, and the well-written briefs of able counsel, we are convinced that judgment must be given for plaintiff.

In Title IV, Chapter 2 of the LSA–Civil Code, Article 1779 reads:

"Four requisites are necessary to the validity of a contract:

"1. Parties legally capable of contracting.

"2. Their consent legally given.

"3. A certain object, which forms the matter of agreement.

"4. A lawful purpose."

The subsequent sections of Chapter 2 explain these four requisites to the formation of obligations. Section 4, corresponding to the fourth requisite, that of a lawful purpose, begins with Article 1893:

"An obligation without a cause, or with a false or unlawful cause, can have no effect."

Three other articles are pertinent to the problem here:

"*Article 1894*: "An agreement is not the less valid, though the cause be not expressed."

*Article 1895*: "The cause is unlawful, when it is forbidden by law, when it is *contra bonos mores* (contrary to moral conduct) or to public order."

*Article 1896*: "By the *cause* of the contract, in this section, is meant the consideration or motive for making it; and a contract is said to be without a cause, whenever the party was in error, supposing that which was his inducement for contracting to exist, when in fact is had never existed, or had ceased to exist before the contract was made."

Although, as will be seen, Article 1779 of the LSA–Civil Code does not mention that there must be a serious consideration for the formation of a valid obligation, the Louisiana courts have accepted such a requisite, based on the

early case of Murray v. Barnhart, 1906, 117 La. 1023, 42 So. 489, 491.[2] The Court relied on LSA–C.C. Art. 2464, requiring that the price of a sale be serious and not out of all proportion with the value of the thing sold. It then stated that:

" * * * That article has special reference to the price of a sale, but the principle it involves is not pe- ·culiar to sales. It is a general principal of the civil law, and as old as the civil law itself. * * * "

Morriss and Howard rely on this rule. While we believe that common law bargain consideration is not synonymous with, or necessarily the equivalent of, the word "cause" in LSA–C.C. Art. 1893, other than that required in sales,[3] we are bound to follow the substantive law of Louisiana in determining whether defendants have made a binding agreement.[4]

■ It is true, of course, that the salaries paid to defendants were in return for their services and therefore cannot qualify as consideration[5] for the stock option, and the payment of $10, as recited in the Agreement, is out of proportion to the value of the stock subject to the option. However, we are not bound by the literal terms of the Agreement for the true cause or consideration can be established by competent proof *aliunde*.[6]

■ Examining the circumstances leading up to execution of the Agreement, it is evident that defendants believed that the signing of a stock restriction agreement was one of the conditions for a successful public offering of the stock. Without outside capital, reorganization of Georesearch would not have

been realized. Thus, the true cause of the Agreement was to enable the defendants to receive an opportunity—an opportunity to continue an organization they had pieced together during the previous three years, an opportunity to obtain capital with which to explore for oil and gas in such a manner as to prove their theory that a small company could successfully employ the more expensive techniques of larger oil companies. The "serious consideration" received by the defendants was in the form of almost $75,-000 worth of stock in exchange for stock worth $5,600 for which they had paid $3,200. In essence, they agreed to restrict $75,000 worth of stock in order to receive outright $75,000 worth of stock. Under these circumstances, it cannot be successfully urged that defendants received no "serious consideration" for signing the Agreement.

■ Defendants' action in signing the extension agreement also was in return for a serious consideration in that they wanted additional time to attempt to bring about a merger of Georesearch and Oceanic Oil. They hoped such a merger would place Georesearch back on a sound economic footing, giving it an opportunity again to attempt successful operation, which in turn would enhance the value of their stock. Morriss testified to his belief that the merger would not ma- · terialize unless he remained in the negotiations, and he signed the extension agreement in order to continue with the arrangements. Although the value of what he would have received had the merger been consummated is not subject to exact estimation in terms of money, it is not so inconsequential as to be considered out of all proportion with what he surrendered.

---

2. See also, Blanchard v. Haber, 166 La. 1014, 118 So. 117; Hirsch v. Rosenberg, La.App., 14 So.2d 331; Shreveport Laundries v. Teagle, La.App., 139 So. 563; Spanier v. DeVoe, 52 La.Ann. 581, 27 So. 174; D'Orgenoy v. Droz, 13 La. 382.

3. See Smith, "A Refresher Course in *Cause*," 12 Louisiana Law Review 2.

4. Erie Railroad Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

5. Blanchard v. Haber, supra.

6. LSA–C.C. Art. 1894; Jackson v. Miller, 32 La.Ann. 432; Moore v. Pitre, 149 La. 910, 90 So. 252; Smith v. Southern Kraft Corp., 202 La. 1019, 13 So.2d 335.

Based on the premise that the Agreement contains both a principal obligation of an employment contract and the penalty obligation that defendants would sell one half of their shares of stock at a price of $ .07 a share, defendants argue that a penalty obligation is unenforceable under Louisiana law. If we should rule that it is enforceable, the defendants contend that this particular penalty is invalid because it is excessive.

■■ The Louisiana law relied on to defeat the penalty obligation is the principle that a contract which is *contra bonos mores* is unenforceable.[7] Clearly, this legal doctrine is inapplicable here. It applies to contracts which are founded on an immoral purpose such as the leasing of a house to be used for purposes of prostitution,[8] attempts to recover a share of the profits in a gambling establishment in lieu of wages,[9] and actions to recover what has been won or lost in gambling.[10] Defendants have cited no authority, nor have we found any, to support their contention that this Agreement was *contra bonos mores*. Nor is there any merit to the argument that LSA–R.S. 23:634 and 23:635 prohibit enforcement of the Agreement.[11] Obviously these statutes were never designed to prohibit stock op-

tion agreements between corporate officers and the corporation.

■ Defendants have cited LSA–C.C. Art. 2125 [12] and numerous cases in support of their contention that a penalty clause or obligation in a contract is unenforceable if it is excessive. However, LSA–C.C. Art. 1934 specifically states that:

"Where the object of the contract is any thing but the payment of money, the damages due to the creditor for its breach are the amount of the loss he has sustained, and the profit of which he has been deprived, under the following exceptions and modifications:

\* \* \* \* \* \*

"5. Where the parties, by their contract, have determined the sum that shall be paid as damages for its breach, the creditor must recover that sum, but is not entitled to more. But when the contract is executed in part, the damages agreed on by the parties may be reduced to the loss really suffered, and the gain of which the party has been deprived, unless there has been an express agreement that the sum fixed by the contract shall be paid, even on a partial breach of the agreement."

7. Citing LSA–C.C. Arts. 1892, 1895, 2031.

8. Kathman v. Walters, 22 La.Ann. 54; Rosenblath v. Sanders, 150 La. 882, 91 So. 252.

9. Britt v. Davis Bros., 118 La. 597, 43 So. 248, 118 Am.St.Rep. 390.

10. Wilson v. Sawyer, La.App., 106 So.2d 831.

11. LSA–R.S. 23:634 —
"§ 634. *Contract forfeiting wages on discharge unlawful*
"No person, acting either for himself or as agent or otherwise, shall require any of his employees to sign contracts by which the employees shall forfeit their wages if discharged before the contract is completed or if the employees resign their employment before the contract is completed; but in all such cases the employees shall be entitled to the wages

actually earned up to the time of their discharge or resignation."
"§ 635. *Assessment of fines against employees unlawful; exceptions*
"No person, acting either for himself or as agent or otherwise, shall assess any fines against his employees or deduct any sum as fines from their wages. This section shall not apply in cases where the employees wilfully or negligently damage goods or works, or in cases where the employees wilfully or negligently damage or break the property of the employer, but in such cases the fines shall not exceed the actual damage done."

12. "Art. 2125. The penal clause is the compensation for the damages which the creditor sustains by the non-execution of the principal obligation.
"He can not demand the principal and the penalty together, unless the latter be stipulated for the mere delay."

If we are in error as to the above-stated conclusions, defendants' major premise that there is here presented a principal obligation embracing an employment contract, and a subsidiary agreement for a penalty, is fallacious. The Agreement does not embrace an employment contract at all. It is merely a restriction on the right of the defendants to sell their stock under certain stated conditions. Examination of the Agreement reveals that defendants' employment could either terminate or continue, and the option to purchase would or would not necessarily be subject to exercise. For example, the Agreement provides that if defendants decided to sell their stock they must first have offered to sell it to the corporation. In this instance, their continued employment would have had no part in their obligation to sell. Again, if the corporation should have decided to decrease defendants' salaries below a reasonable sum commensurate with their responsibilities, they were at liberty under the Agreement to resign voluntarily without being obligated to offer one half of their stock to the corporation at the option price. In essence, the principal obligation under the Agreement was to sell one half of their stock to the corporation when demand was made on them to do so, but the right to demand that they sell could only arise under certain conditions.

Since the obligation which defendants term as a penalty is actually the principal obligation, the question of whether a penalty clause is enforceable under Louisiana law is not at issue here.

▇ Defendants further urge that the obligation imposed on them to sell one half of their stock is subject to a potestative condition in that the Board of Directors had sole discretion as to what constituted "cause" for discharge. Considering the principles applicable to potestative conditions, this argument cannot withstand close scrutiny.

Four articles of the Civil Code are applicable to this phase of the problem:

LSA-C.C. Art. 2024:

"The potestative condition is that which makes the execution of the agreement depend on an event which it is in the power of the one or the other of the contracting parties to bring about or to hinder."

LSA-C.C. Art. 2034:

"Every obligation is null, that has been contracted, on a potestative condition, on the part of him who binds himself."

LSA-C.C. Art. 2035:

"The last preceding article is limited to potestative conditions, which make the obligation depend solely on the exercise of the obligor's will; but if the condition be, that the obligor shall do or not do a certain act, although the doing or not doing of the act depends on the will of the obligor, yet the obligation depending on such condition, is not void."

LSA-C.C. Art. 2036:

"An obligation may also be made, by consent of the parties, to depend on the will of the obligee for its duration. Thus a lease may be made during the will of the lessor, and a sale may be made conditioned to be void, if the vendor chooses to redeem the property sold."

From these articles it is seen that only if a condition depends solely on the exercise of the *obligor's* will can the condition be termed as potestative. The question then is whether the corporation is the obligor under the Agreement.

The obligation of an option agreement is to turn over or deliver the object of the contract upon demand of the other party. The person who is obligated to make such delivery is the obligor. The obligors in this instance are defendants. The obligee is the corporation. The event which activated the heretofore suspended contract into a commutative, binding, enforceable contract is the termination of employment of the obligors. That this event might possibly be potestative in that it may turn on the will of the corporation does not of itself render the con-

tract unenforceable. These principles are more clearly set forth in the case of Conques v. Andrus, 1926, 162 La. 73, 110 So. 93, 94, where the Court stated:

"There is no prohibition and no nullity is pronounced against an agreement the execution of which by the obligor is made to depend on the will of the obligee or contractee.

"And the reason for this difference in the effect of such a condition is: (1) That if the contract is made to depend solely on the will of the obligor there would be lacking a mutuality of obligation between the parties, without which no valid contract can exist; and (2) a contract by which a person assumes an obligation to do a certain thing and at the same time reserves to himself the privilege of electing not to execute is no contract at all.

"This is not true, however, where the performance of an obligation is made to depend on the will of the party to whom the promise is made. In all such cases when the obligee in the exercise of the option granted him elects to have the obligation in his favor executed, the contract which until that event happens is suspended becomes a commutative, binding, and enforceable contract.

"Parties are at liberty to make any kind of contract they see fit to make, and which is not contrary to law, public policy, or good morals. And it is a familiar principle that as a person binds himself so shall he be bound and remain bound until discharged by law or released by con-sent of the person to whom he is bound.

\* \* \* \* \* \*

"The lessor in each of the cited cases bound himself unconditionally to sell the property leased at a fixed price at any time during the term of the lease if the lessee elected to purchase. The lessee elected to purchase, and the court enforced the contract.

"The condition in those cases was clearly potestative, but was only so on the part of the lessee or obligee, and hence did not fall under the condemnation of the articles of the Code."

Discharge of the defendants, however, is not left to the will of the corporation. Only a discharge which is for "cause" can obligate the defendants to sell to the corporation, at its option, one half of their shares of stock. What constitutes "cause" is a question which the Court will answer *infra* after considering all of the circumstances surrounding the Agreement, and defendants' performance, *vel non*, of their duties as executive officers of plaintiff.

▮ Finally, on this phase of the case, the defendants urge that under Delaware law Georesearch cannot repurchase its shares of stock from defendants because it does not have an earned surplus with which to do so. This contention is based on Section 160 of Delaware Corporation Law, 8 Del.C. § 160 [13] and several cases [14] interpreting that section and similar statutes in other states. Plaintiff corporation contends that "impairment of capital" in Section 160 must be interpreted in the light of Section 154, 8 Del. C. § 154 [15] which defines capital in this

---

13. "Every corporation organized under this chapter may purchase, hold, sell and transfer shares of its own capital stock; but no such corporation shall use its funds or property for the purchase of its own shares of capital stock when such use would cause any impairment of the capital of the corporation \* \* \*." Delaware Corporation . Law Annotated, (10th ed.) 1957.

14. Ashman v. Miller, 6 Cir., 1939, 101 F. 2d 85; Acker v. Girard Transit Co., 3 Cir., 1930, 42 F.2d 37; Jackson v. Colagrossi, 1957, 50 Wash.2d 572, 313 P.2d 697.

15. § 154. Delaware Corporation Law: *Determination of Amount of Capital*
"Any corporation may, by resolution of its board of directors, determine that only a part of the consideration which

instance to be an amount "equal to the aggregate par value of such shares." Plaintiff argues that its capital is $580,-000 and if it has any surplus, either earned or capital, above that amount, it may purchase the defendants' stock.

Defendants cite as controlling the case of Jackson v. Colagrossi, 50 Wash.2d 572, 313 P.2d 697, 699. That case held that unless a corporation had an *earned* surplus it could not repurchase its own shares of stock. This decision was based on a Washington statute which read:

> "Every corporation organized hereunder shall have the power to purchase, hold, sell and transfer shares of its own capital stock: *Provided*, That no such corporation shall use its funds or property for the purchase of its own shares of capital stock when such use would cause any impairment of the *capital stock* of the corporation." RCW 23.08.080. (Last emphasis supplied.)

As noted, the Washington statute has substituted the phrase "capital stock" for "capital" in the Delaware statute. The leading case in Delaware interpreting its statute is Re International Radiator Co., 10 Del.Ch. 358, 92 A. 255, 256. The Court in that case stated:

> "* * * In the statute the impairment of the 'capital' of the company is mentioned. As here used, this means the reduction of the amount of the assets of the company below the amount represented by the aggregate outstanding shares of the capital stock of the company. In other words, a corporation may use only its surplus for the purchase of shares of its own capital stock. 'Capital' does not in this connection mean the assets of the company, for, of course, the assets are reduced when any of it is used by a corporation to purchase shares of its own capital stock. It must have some other meaning then. The statute must mean, therefore, that the funds and property of the company shall not be used for the purchase * * * of its own capital stock when the value of its assets is less than the aggregate amount of all the shares of its capital stock. A use by a corporation of its assets to purchase shares of its own capital stock under such conditions impairs the capital of the company."

The case of Ashman v. Miller, 6 Cir., 1939, 101 F.2d 85, 90, gives this explanation of the Delaware statute and the Radiator case:

> "Section 19 of the General Corporation Act of Delaware (Rev.Code 1935, § 2051) expressly confers on a corporation the power to purchase its own stock provided it can do so without impairing its capital.
>
> "Capital impairment as here used means the reduction of the amount of the assets of the company below the amount represented by the aggregate outstanding shares of the

---

shall be received by the corporation for any of the shares of its capital stock which it shall issue from time to time shall be capital; but, in case any of the shares issued shall be shares having a par value, the amount of the part of such consideration so determined to be capital shall be in excess of the aggregate par value of the shares issued for such consideration having a par value, unless all the shares issued shall be shares having a par value, in which case the amount of the part of such consideration so determined to be capital need be only equal to the aggregate par value of such shares. In each such case the board of directors shall specify in dollars the part of such consideration which shall be capital. If the board of directors shall not have determined (1) at the time of issue of any shares of the capital stock of the corporation issued for cash or (2) within 60 days after the issue of any shares of the capital stock of the corporation issued for property other than cash what part of the consideration for such shares shall be capital, the capital of the corporation in respect of such shares shall be an amount equal to the aggregate par value of such shares having a par value, plus the amount of the consideration for such shares without par value. * * * "

capital stock of the company. In other words a corporation under the Delaware Statute may use only its surplus for the purchase of shares of its capital stock. Capital does not in this connection mean the assets of the company for of course the assets are reduced when any of it is used by a corporation to purchase shares of its capital stock. It means that the funds and property of the company shall not be used for the purchase of shares of its capital stock when the value of its assets is less than the aggregate amount of all the shares of its capital stock outstanding. In re International Radiator Company, 10 Del.Ch. 358, 92 A. 255."

The Jackson case specifically states that a corporation can only use *earned* surplus to repurchase its shares of stock. However, neither of the above cited Delaware cases draws this distinction. Rather, the Ashman case speaks only of surplus without further limitation. Additional research reveals no other Delaware cases on this issue. In the light of the definition in Section 154, Delaware Corporation Law, of the word "capital" we rule that the plaintiff corporation may repurchase its own shares of stock if it has a *capital* surplus. Capital surplus is that sum which equals the difference between the total amount of cash received for all of the corporation's outstanding shares of stock and the par value of such shares. In this instance, the Financial Statement of Georesearch, Inc., as of November 30, 1957, reveals that it had a capital surplus of $519,154.72. It had an earned surplus deficit of $403,963.93, leaving a sum of $115,190.79 which can properly be considered as surplus over and above its capital which is reserved for the protection of its creditors. This sum properly may be used to repurchase defendants' stock.

The question of whether the defendants were discharged for "cause" is not so easily answered. It is primarily a factual question which involves all of the circumstances and events surrounding the Agreement and the results of defendants' employment.

Although the law is far from clear and comprehensive, we believe that Wells v. Sherrill Hardwood Lumber Co., 1922, 151 La. 1081, 92 So. 706, and Evans v. Delta By-Products, Inc., La.App.1951, 52 So.2d 593, cited by plaintiff, state the law correctly to be that if a person is not achieving the results for which he was hired, whether it be due to incompetency, inefficiency or some other cause within his control, the employer may discharge him from his employ.

Both of these cases relied on LSA–C.C. Art. 2749 which reads:

"If, without any serious ground of complaint, a man should send away a laborer whose services he has hired for a certain time, before that time has expired, he shall be bound to pay to such laborer the whole of the salaries which he would have been entitled to receive, had the full term of his services arrived."

The Wells case involved an attempt by the former sales manager of defendant corporation to recover wages allegedly due under an employment contract. The Court, in rejecting plaintiff's demands, ruled [151 La. 1081, 92 So. 708]:

" * * * Plaintiff admits that it was his duty to know what the plant could produce and to know the amount and quality of the stock on hand, and of course offers explanations in justification of his acts, but the fact remains that defendant was not getting the results which it had a right to anticipate when it employed him. Whether this was due to incompetency or inefficiency or other causes it is difficult to say, but it obviously offered serious enough ground of complaint on the part of defendant, as required under the cited provisions of the Code, to justify the dismissal of its employee. * * "

In the Evans case, plaintiff had been employed by the defendant corporation as a consultant and designer of a salvage

machine. After his discharge he brought suit for future wages. The record showed that plaintiff made several costly design errors, was unable to answer simple mathematical problems, and developed a frame of mind which made it almost impossible for him to work in harmony with the president of the corporation. In holding for the defendant, the Court stated [52 So.2d 597]:

"It must be conceded, of course, that Bennett would not have been justified in constantly changing his ideas and in having 'brain storms' if the record disclosed that the work of Evans indicated a complete understanding of what he was supposed to do, but the record leaves us with an entirely different conclusion. We feel that he was not competent to do the work which, under the contract —written or verbal—he undertook to do, and that therefore the corporation was justified in terminating his services."

This rule is entirely consistent with our economic system where competition is the order of the day. If an employer must retain an employee who is inefficient and incompetent adequately to perform the job he was hired to do, the employer would be met with rising overhead expenses so burdensome as completely to stifle his economic growth and competitive ability. Such a rule would place a heavy burden on the employer to conduct a costly, time-consuming investigation on each prospective employee to ascertain his abilities and shortcomings, knowing that if his investigation proved erroneous the employee must be paid in full to the end of the term for which he was employed.[16]

Defendants have argued that to constitute "cause" for their discharge they should have done or failed to have done acts of a far more serious nature than would constitute "cause" under LSA-C.C.

Art. 2749, since they stand to lose considerably more than mere future earnings. They have cited several cases as examples of what constitutes "cause" under the cited provision of the Civil Code.[17]

As stated, each case of this kind must be decided on its own facts and circumstances under the general rule which we believe to be correct. Careful study of the cases relied upon by defendants reveals that this rule was followed in each instance, depending upon the merits of the case.

In the Van Denburgh case the defendant insurance agency was held to have had no "cause" to discharge the plaintiff as manager of its casualty and surety department on the ground that another person was coming into the agency and plaintiff's department was showing a loss.

In the Roberts case, the Court held that there was insufficient cause to discharge plaintiff as general manager of the defendant company based on his having bought and sold fish in the last month of employment at a loss of $267.91, knowing that the company was only in the business of buying and selling oysters. The Court found that the charter specifically declared that the business of the defendant company was to buy and sell fish and other sea food. Further, that the charge that plaintiff had packed an excessive amount of water in the oysters, causing rebates to be made, was not supported by evidence as to a standard in the trade for the shipment of oysters, nor that the company had suffered any loss. In addition, the Court found that the board of directors knew and approved the way that plaintiff packed the oysters.

In the Laneuville case, the Court affirmed the lower Court, holding that whether the plaintiff had been discharged for cause from his position as manager of the defendant insurance agency was a question of credibility of the witnesses.

16. Cf., LSA-C.C. art. 2749.

17. Van Denburgh v. H. T. Higginbotham, 168 La. 461, 122 So. 581; Roberts v. J. A. Masquere Co., 158 La. 642, 104 So. 484; Laneuville v. Majestic Ind. Life Ins. Co., 223 La. 724, 66 So.2d 786; Travis v. Swearingen, La.App., 143 So. 509.

In the Travis case, the defendant employee successfully explained away each allegation of the plaintiff employer for his discharge as manager of plaintiff's farm.

Under the general rule that an employee can be discharged if he is not achieving the results for which he was hired, whether it be due to incompetency, inefficiency or some other cause within his control, the defendants were properly discharged for cause. Morriss and Howard were hired as president and vice-president of Georesearch, Inc., and their job was to manage and operate the corporation properly, engaging primarily in developing oil potentials through use of a technique known as a seismic survey. Once an oil prospect was developed, their job was to obtain outside capital to contribute, along with Georesearch, to the cost of drilling for oil. Without narrating in detail the complete web of events, suffice it to say that the company was unsuccessful in all its aspects, primarily because its executive officers either could not or would not perform as the corporation had the right to expect of them.

As noted above, the drilling program conducted by them was singularly a failure, and they made no real effort to reduce overhead, despite repeated prodding from the Board of Directors. Outside capital was not forthcoming. Morriss had attempted to obtain syndicate money prior to the recapitalization but failed. He was informed at the initial organizational meeting that that type of financing was not available in the industry at that time. Their financial efforts were then turned toward obtaining money on a deal-by-deal basis. Defendants urge that when syndicate money was found to be not available one of the main backbones of the organization was absent from the beginning. It is interesting to note that this did not deter them at all from joining in the reorganization. They continued with their plans and completed the recapitalization. If syndicate money was as important to the success of the newly-formed corporation as defendants contend, they never would have attempted to swing into full operation knowing definitely that it would not be available.

Financially, it can be seen from the facts stated above that the affairs of the corporation were conducted by defendants in a most unsuccessful manner. Little more need be said except to reiterate that over $700,000 was expended during the twenty-two months of defendants' employment with no appreciable results. In addition, and purely as a measure of their apparent inability, it is noted that over $600,000 was spent during the three years that Georesearch worked for Texas Eastern Transmission Company, developing oil prospects, but without any production.

Defendants argue that the Board of Directors or the operating committee approved and ratified all the expenditures and operations of Georesearch and therefore defendants should not be blamed for its failure. This argument is in keeping with the general rule that the directors are the managers of the corporation. However, the type of business conducted by Georesearch was unusual in that it was searching for oil prospects which required detailed study of large geographical areas. Each area that showed potential oil development was different from any other area, in that other oil operators and producers were interested in the land. It was necessary to piece together leases or farm-outs, dry-hole money, and many other elements. In essence, it is not the type of business that can be conducted from the board room. By and large, the Board of Directors were dependent upon defendants, as the active managers of the corporation, to propose what courses of action they thought it best for the corporation to pursue. The decision to drill a particular oil prospect had to be based on geological and geophysical information obtained through defendants. The Board could and did give their experienced advice from time to time but the original concept of operation was the product of defendants' imagination and the success or failure of

the corporation hinged on the value of that concept. This point can be summarized by the following excerpt from Morriss' testimony:

"The Court: Let me ask you if this is a fair summary of approximately two years of operation, as far as your relationship with the board is concerned:

"That from the beginning, the board members had different ideas than yours as to the theory under which this operation should take place, but that they went along with your ideas, up to a point, and then they refused to go any further?

"The Witness: There was certainly a difference of opinion, but let me say I had support on the board even in the early stages and the lack of support was not sufficiently strong to veto those actions which we recommended.

"The Court: In other words, they went along with you up to a point where it was obvious something had to be done and then they let you go?

"The Witness: That is correct."

The Agreement itself reflects the basic understanding between the parties. The only possible contribution Morriss and Howard could make to the recapitalization was the information of *potential* oil prospects of no proven value. It is inconceivable that rational, financially successful men such as composed the Board of Directors of the newly-recapitalized corporation, would unqualifiedly grant stock with a market value of almost $150,000 to two individuals with no assurance that they would receive anything in return. The reason for the Agreement as given by defendants was simply to reassure the public investors that defendants would remain with the corporation. This explanation is controverted by the counter-proposals submitted by their attorney as to the meaning of "discharge," which was unqualified in the original draft.

In conclusion, it is seen that defendants executed a valid agreement, believing that they could successfully develop oil prospects which would attract investments of outside venture capital, which, together with the capital of Georesearch, would enable them to engage in a productive drilling program. Their techniques for such a small company were unproven then and now. Having failed in their efforts, they will be bound by their agreement.

For the reasons assigned, judgment will be given for plaintiff as prayed; and defendants' counterclaims will be rejected. Proper decrees should be presented on notice.