JANVIER, Judge.
Plaintiff, J. Owen Evans, seeks solidary judgment for $1,815 against Harrison Albert Bennett and Delta By-Products, Inc., alleging that he was employed by said corporation, through Bennett, to perform certain services and to give expert technical advice in connection with the erection of a salvage machine for the said corporation, and that, prior to the expiration of the contract, Bennett, arbitrarily and unnecessarily interfered with him in the performance of his duties and refused to pay him the “weekly retainer”, as stipulated in the contract, and terminated his employment. The amount sued for is said to represent the balance which he would have earned as a result of the agreement that he was to be paid $50 per week. In his testimony he stated that the amount claimed should have been $1,850 instead of $1,815, but his counsel conceded that the claim must be limited to the amount claimed in the petition.
Bennett denied that he had personally employed plaintiff, or that he arbitrarily or unnecessarily interfered with plaintiff in the performance of his work, and both Bennett and Delta By-Products, Inc., averred that plaintiff was engaged by the corporation, but that the services which he was engaged to perform were so unskillfully performed and that his work was so unsatisfactory that it became necessary to terminate the employment.
There was judgment dismissing plaintiff’s suit and he has appealed.
The record indicates that Harrison Albert Bennett, one of the defendants who was interested in other business ventures elsewhere, conceived the possibility of organizing a corporation in New Orleans for the purpose of entering into a contract with the City of New Orleans for some purpose in connection with the salvaging of various kinds of material, apparently from refuse of different kinds.
It is shown that during the fall of 1947, Bennett employed the plaintiff, Evans, to design what is known as a salvage machine and that Evans prepared and submitted to Bennett during November, 1947, plans for such a machine.
The record shows that Evans received full payment from Bennett for all work which he had done up to that time. The record also shows that when, in 1948, it became apparent that Bennett and those associated with him would be successful in obtaining a contract from the City of New Orleans, they organized a corporation by charter, passed before a notary public in New Orleans on October 12, 1948. This charter was recorded in the office of the Recorder of Mortgages for the Parish of Orleans on October 13, 1948. The name of the corporation was Delta By-Products, Inc., and Bennett became President and General Manager.
It is against this corporation and against Bennett' individually that plaintiff, Evans, has brought this suit. He alleges that he was employed by Bennett and by the cor *595 poration to prepare plans for the salvage machine and to give advice in connection with its construction. He alleges that under the contract he was to be paid $50 per week, and that the employment was to continue until the final completion of the machine; that he performed all duties imposed upon him by the contract from October 15, 1948, the day on which he alleges that he was employed, until April 1, 1949, when he was arbitrarily dismissed by the said Bennett. He further alleges that bad he been permitted to continue to perform his services under the contract he would have earned an additional $1,815, and that is the amount for which he prays for judgment.
So far as Bennett individually is concerned, the record leaves no doubt whatever that in any agreement made with Evans he was acting in his capacity as President and General Manager of Delta By-Products, Inc., and that Evans knew of the incorporation of the concern and well understood that he was contracting with Bennett as the representative of that corporation.
It is argued by counsel for plaintiff that this could not have been so since the corporation was not registered with the Secretary of State of Louisiana until after October 15th, and, according to counsel, the corporation therefore did not come into existence until the charter was registered with the Secretary of State.
In the first place, we cannot agree with this contention, and, in the second place, it is clear that even if the legal result was as contended by plaintiff and the corporation did not come into existence until its charter was registered with the Secretary of State, there is no doubt at all that the charter had already been passed and had been registered in the office of the Recorder of Mortgages when the contract was entered into with Evans, and that both Evans and Bennett knew that Evans was being employed to do work for the corporation and not for Bennett personally.
There is a violent dispute over whether the contract was evidenced by a letter which Evans wrote to Bennett on October 15, 1948, or whether there was a mere verbal agreement that Evans would design and give advice as to the construction of the salvage machine. Whether the contract was evidenced by the written offer of Evans, which was never accepted in writing by the corporation, or was a mere verbal contract is unimportant, since it is conceded that Evans was to receive $50 per week so long as he worked for the corporation and since, in either event, we believe that if the services proved unsatisfactory to such an extent as to indicate that Evans was incapable of rendering the services which he contracted to render, his services could be terminated regardless of the term fixed in the contract.
Counsel for plaintiff contends that because of the effect of Article 2749 of our Civil Code, the corporation had no right to terminate the services of the plaintiff. That article reads as follows: “If, without any serious ground of complaint, a man should send away a laborer whose services he has hired for a certain time, before that time has expired, he shall be bound to pay to such laborer the whole of the salaries, which he would have been entitled to receive, had the full term of his services, arrived.”
On reading the article our attention is immediately attracted by the words “without any serious ground of complaint,” and we conclude that if there is a serious and: well founded ground of complaint, the article would not prevent the discharge of art unsatisfactory employee, whether employed, under contract to do a certain job or employed on a weekly stipend. This was held by the Supreme Court in Wells v. Sherill Hardwood Lumber Co., 151 La. 1081, 92 So. 706, and we so held in Jacobs v. Helmer Ehrman & Co., 14 Orleans App. 443. See,, also, McClure v. Dykes, La.App., 14 So.2d. 835.
Counsel for plaintiff also cites Article 2765, and contends that, in any event, plaintiff is entitled to “damages” resulting from the arbitrary discharge, and that these damages amount to the sum which he would: have earned. That article reads as follows: “The proprietor has a right to cancel at' pleasure the bargain he has made, even in case the work has already been commenced,_ *596 by paying, the undertaker for the expense and labor already incurred, and such damages as the nature of the case may require.”
All that that. article means is that the “proprietor” may discharge the employee, even without cause, upon paying for the services; already rendered and such amount as may be fixed, as the damages sustained, but it in no way interferes with the operation of Article 2749 from which,. in our opinion, it is, obviously intended that the employer may discharge the employee “for cause.”
A careful reading of the testimony leaves no doubt at all of the unsatisfactory services of Evans, who was not a graduate engineer of any university and claims that his knowledge of engineering problems had come solely from his prior experience. He did show that he was a member of certain engineering societies. Very early in the course of the construction of the machine it became apparent that certain trusses, which he had .designed and which we gather extended across the entire building and supported .the roof, were considerably shorter than had been contemplated, and, as a result, it became necessary to make the building somewhat narrower than contemplated either by him or the officers of the corporation. A study of his testimony as to how this occurred reveals rather plainly that he had no'idea at all as to what was the cause of this error.
When counsel for ■ defendants insisted that he attempt to state how he had made such an error, he said that he had not checked to see, adding: “I was busy with other things.”
Counsel for plaintiff interrogated him on certain mathematical questions which, it seems to us, a grammar school student could have answered. He was asked, for instance, how many feet there are in 250 inches, and he answered: “I couldn’t say.” He was asked whether he could not figure it out and he said: “I have always used decimals in my work.”
Another very obvious error was in calculating the height of a “baler”. We are not told just what a “baler” is, but the record shows that he calculated the size of this baler and that it was built in a factory elsewhere; that when it arrived, it was 15 inches too low and that an extension of 15 inches had to be added; that this involved an additional cost of $500 in addition to the expense of transportation and the resulting delay.
It is also shown, that two motors were necessary, and that the plaintiff figured that in one case a 30 horsepower motor, would be required and in the other a 35 horsepower motor would be necessary. The record shows, without contradiction, that instead of the .motors of 30 and 35 horsepower, the corporation installed motors, of 3 and 5 horsepower respectively and that the machine has been in operation for more than a year and has operated with entire satisfaction.
Bennett testified that the final reason for terminating the service was that, after so many unsatisfactory episodes, he finally went to Birmingham and was gone for about a week, and that before he left he told Evans that he wanted to be certain that the “pit” was completely designed by the time of his return, and that when he returned the “pit” had not been designed except that, according to Bennett, “he came out with some sort of little sketch”. Bennett says: “I tore the thing up; It was absolutely worthless. I went to my office and drew it on a 10 x 12 paper with a rule * *
Our conclusion is that the services of Evans were entirely unsatisfactory and that Bennett, as President and General Manager of the corporation, was fully justified in terminating those services.
In addition to the fact that the services were found unsatisfactory, it is very evident that Evans had developed a frame of mind which made it practically impossible for him to work in harmony or satisfactorily under Bennett’s instructions. He was very critical of Bennett, contending that every few minutes he changed his mind and changed his plans. He says that Bennett “was developing about 50 ideas a minute”, and that Bennett changed his mind “as fast as either one of us could talk.” At another part of his testimony, he referred to a suggestion of Bennett as “another one of his brain storms * *
*597 It must be conceded, of course, that Bennett would not have been justified' in constantly changing his ideas and in having “brain storms” if the record disclosed that the work of Evans indicated a complete understanding of what he was supposed to do, but the record leaves us with an entirely different conclusion. We feel that he was not competent to do the work which, under the contract — written or verbal — he undertook to do, and that therefore the corporation was justified in terminating his services.
The record does not make it certain that he was paid for the full period of his services. There is only one week during which he claims he worked and for which he was not paid, and the record does not convince us that his figuring in this particular is accurate.
Accordingly, the judgment appealed from is affirmed at the cost of appellant.
Affirmed.