593 So.2d 741 (1992)
NEEB-KEARNEY AND COMPANY, INC.
v.
William F. RELLSTAB.
Nos. 90-CA-1690, 91-CA-0299 and 91-CA-0822.
Court of Appeal of Louisiana, Fourth Circuit.
January 10, 1992.
Writ Denied March 26, 1992.
*742 Nathan T. Gisclair, Jr., Brian T. Leftwich, David W. O'Quinn, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, for plaintiff/appellant.
Henry W. Kinney, III, Suzanne E. Ecuyer, New Orleans, for defendant/appellant.
Before BARRY, WILLIAMS and PLOTKIN, JJ.
BARRY, Judge.
Neeb-Kearney appeals a judgment which denies a permanent injunction to restrain William Rellstab from acting as a consultant to a coffee warehousing company allegedly in violation of his noncompete agreement.

PROCEDURAL HISTORY
On February 16, 1990 Neeb-Kearney and Company, Inc. (Neeb-Kearney) sought a preliminary and permanent injunction against William Rellstab and damages for breach of a non-competition agreement. The trial court granted Rellstab's exception of improper accumulation of actions and on March 30, 1991 Neeb-Kearney filed a supplemental petition for injunctive relief and reserved its right to claim damages. The trial court denied Rellstab's other exceptions.
Based on affidavits and deposition testimony[1] the trial court issued a preliminary injunction on June 1, 1990 which prohibited Rellstab from acting as a consultant to Dupuy Storage & Forwarding Company (Dupuy) and/or otherwise violating the noncompete provisions of the stock purchase agreement between Neeb-Kearney and Rellstab. The court concluded that the noncompete agreement was enforceable, the parties had freely agreed, Rellstab was terminated for cause and his employment with a competitor violated the agreement.
Rellstab's request for a stay pending appeal was denied June 5, 1990 by a judge pro tempore.
*743 In a writ application Rellstab complained of the denial, appealed the preliminary injunction and requested a stay. This Court denied a stay and advised that he had a right to apply to the trial court which issued the injunction for a stay and to request an expedited hearing of his appeal after it was properly lodged. (No. 90-C-1031). Rellstab's request for a stay below was denied and he properly lodged an appeal of the preliminary injunction (No. 90-CA-1690).
After one witness' partial testimony at the trial for a permanent injunction, the matter was referred to a commissioner who recommended dismissal of the suit. Neeb-Kearney filed exceptions to the commissioner's findings and Rellstab filed a rule to stay the injunction. Neeb-Kearney's motion to consolidate the exceptions and Rellstab's rule to stay the preliminary injunction was granted. Rellstab filed rules to dissolve the injunction and for damages and attorney's fees and to increase Neeb-Kearney's bond. On December 10, 1990 the trial court denied any opposition, adopted the commissioner's recommendation and dismissed Neeb-Kearney's suit, recalled all preliminary writs and reserved other contractual determinations.
Neeb-Kearney's appeal of the December 10, 1990 judgment (No. 91-CA-0299) and Rellstab's previous appeal of the issuance of the preliminary injunction (No. 90-CA-1690) were consolidated. Rellstab answered Neeb-Kearney's appeal as to the trial court's failure to consider his request for damages and attorney's fees for the wrongful issuance of the preliminary injunction and subsequently filed an appeal (No. 91-CA-0822) which raised the same issues as his answer to Neeb-Kearney's appeal. The three appeals have been consolidated. Rellstab's motion to strike certain documents and arguments raised for the first time in brief was ruled on by this Court: "Only matters in the record are considered on appeal. Contents of a brief are subject to discussion during oral argument."

APPEAL ISSUES
Neeb-Kearney argues:
1) The noncompete provision of the agreement is enforceable because (A) Rellstab, as a shareholder and executive, entered into the provision as part of the stock sale of the company and (B) Neeb-Kearney prepared and circulated a brochure prominently featuring Rellstab's association with its coffee business at a cost of more than $20,000;
2) The contract is enforceable because Rellstab was terminated for cause for failing to discharge his duties;
3) The commissioner erred by finding that Rellstab's employment by Dupuy, Neeb-Kearney's only significant competitor, does not violate the noncompete provision;
4) Rellstab's entitlement to damages and attorney's fees became moot on the denial of the permanent injunction.
Rellstab argues:
1) The noncompete agreement violates La.R.S. 23:921;
2) He was terminated without cause;
3) Neeb-Kearney failed to prove his work with Dupuy constituted competition;
4) The noncompete agreement ended in May, 1990;
5) The issue of damages and attorney's fees was not heard.

THE RECORD
The following facts were garnered from depositions, affidavits, documents, and trial testimony.
Rellstab was employed in the coffee warehousing, blending and distribution business beginning in 1959 when he worked for J. Aron & Company d/b/a Kentucky Warehouse. He was vice-president of distribution and managed the warehouse. In the late 1970's the firm liquidated the coffee importation operation but retained its warehouse and Rellstab was in charge. The warehouse served the entire coffee trade and Rellstab actively solicited warehouse customers. Rellstab was given the option to buy the warehouse assets of *744 Kentucky Warehouse at book value. In 1985 Rellstab allowed S. Jackson Corporation to exercise his option which made the sale possible.
On October 1, 1985 S. Jackson Corporation (principal shareholder Norcom Jackson) merged with Neeb-Kearney (principal shareholder Michael Kearney). It was anticipated that Jackson, Kearney and Rellstab would each receive 1/3 of the stock of the new company; however, Kearney objected to Rellstab having an equal amount of stock unless Rellstab would also assume the company's debt. Rellstab agreed to relinquish some of his stock and the distribution was Kearney, 45%, Jackson, 45% and Rellstab, 10%.
When the corporation was formed Rellstab was on its Board, served as president, and his contribution was his option to purchase the assets of the Kentucky Warehouse operation. Rellstab did not own any real estate and was not personally liable for any company debt. Rellstab was president and chief executive officer until May 20, 1987.
Rellstab met Daniel Haeuser in the summer of 1986. Rellstab and Mike Kearney handled negotiations with Haeuser about his joining the business. Neeb-Kearney was forced to negotiate because it could not survive without the infusion of capital from Haeuser. According to Rellstab, Neeb-Kearney was in bankruptcy and S. Jackson was losing money. Rellstab never had an attorney and Neeb-Kearney originally hired counsel. After December 31, 1986 Rellstab and Kearney did not have counsel, and Haeuser's attorney drafted the final agreement.
During negotiations Rellstab repeatedly stated that he would not be personally liable for the warranty and he wanted his job until age 65. In the original draft of the noncompete contract he was to retain half of his 10% share of stock, the same as Kearney and Jackson (half of their 45% share). However, when he would not sign the warranty he relinquished his stock.
Rellstab had a stroke in April, 1987 and his speech and right hand were impaired. He did not work for six to eight weeks at the time the contract was signed. He said he felt loyalty to the 120 employees and his partners who would suffer if he did not sign the agreement.
It was stipulated that Norcom Jackson would have testified that his company, S. Jackson and Company, and Neeb-Kearney (owned by Mike Kearney) were equal partners. Jackson and Kearney had acquired real estate and were in substantial debt for which they were personally liable. The combined debt of the two companies was over $1,470,000, plus loans on real estate at the time of the May 20, 1987 transaction in which the Haeusers became involved in the company. According to the sale, Jackson was relieved of liability for ½ of the debt, he remained a shareholder in the company, the company was pledged a $350,000 line of credit, and if the company became profitable it would pay overdue rent to Jackson for property used by the company.
The stock purchase agreement (May 20, 1987) between Neeb-Kearney and its shareholders, Michael Kearney, J. Norcom Jackson, Jr., William Rellstab, Louis D. Haeuser, and Daniel L. Haeuser is in evidence. Kearney and Jackson each sold 35 shares of stock and Rellstab sold 20 shares. Kearney and Jackson were to receive $35 per share and Rellstab $20 per share. The Haeusers substituted their guarantee (up to 50%) of the bank loans (Kearney and Jackson personally liable) which totaled $1,471,444. The Haeusers also set up a line of credit of $350,000 for Neeb-Kearney with the Whitney National Bank.
The contract also provided:
2.02 Employees. Beginning May 20, 1987, 1987 [sic] the Company (and/or its Subsidiaries) shall employ Daniel L. Haeuser, Michael W. Kearney, J. Norcom Jackson, Jr. and William F. Rellstab as follows: (a) for the twelve (12) month period beginning as of the date of this Agreement, Daniel L. Haeuser, Michael W. Kearney, J. Norcom Jackson, Jr. and William F. Rellstab shall receive Sixty Thousand and 00/100 Dollars ($60,000.00) salary a year payable monthly.
* * * * * *

*745 (b) Beginning for the second twelve (12) month period from the date of this Agreement, the salary of Michael W. Kearney, J. Norcom Jackson, Jr. and William F. Rellstab shall not be less than $30,000.00 per year. However, the Board of Directors may agree to pay more. Daniel L. Haeuser's salary shall not be less than Sixty Thousand and 00/100 Dollars ($60,000.00) per year.
* * * * * *
(c) The above applies only if the employee is working full time for the Company, and the salary shall not be payable in the event of disability of the employee, inability of the employee to work or if, in fact, said employee does not work full time for any reason.
* * * * * *
13.01 Noncompetition. As an inducement to the Haeusers to purchase the shares of the Shareholders and to perform under this Agreement and as an inducement for the Shareholders to sell their shares to the Haeusers and in order to preserve the good will [sic] of the Company (and/or its Subsidiaries), each of the Shareholders and each of the Haeusers agree that:
(a) For a period of five (5) years from the date of this Agreement or three (3) years from the date such Shareholder or such Haeuser is not employed by the Company (and/or its Subsidiaries), whichever occurs last, such Shareholder and/or such Haeuser will not, directly or indirectly (individually or for, with or through any other person, firm, joint venture, corporation or other entity), compete with the Company (and/or its Subsidiaries) or any of the assigns or successors of its respective businesses in the Gulf Coast of the United States in any of the businesses being conducted as of the date hereof by Company (and/or any of its Subsidiaries);
* * * * * *
(c) Notwithstanding the foregoing, if the employment of a Shareholder or one of the Haeusers is terminated by the Company (and/or its Subsidiaries) without cause, then the said terminated Shareholder or the said Haeuser may compete with the Company (and/or its Subsidiaries). For these purposes termination means that the employment of the said Shareholder or the said Haeuser is ended by the Company without cause....
* * * * * *
(d) Each Shareholder and Haeuser hereby acknowledge that the consideration for the above noncompetition agreement is that the Haeusers, by purchasing the said shares and making the line of credit available, and the guarantying [sic] of corporate debt to the Bank and other agreements of Haeusers as contained in this Agreement benefit all of the shareholders and the Company (and its Subsidiaries) and all parties to this Agreement. In particular William F. Rellstab or any other party to the Agreement acknowledges that part of the consideration to William F. Rellstab is the reduction of Michael W. Kearney's and J. Norcom Jackson, Jr.'s contingent liability on Company (and its Subsidiaries) debts to the Bank.
According to Daniel Haeuser, chairman and CEO of Neeb-Kearney, the final contract resulted from a year of negotiations, primarily with Rellstab. Several drafts were formulated and changed. The noncompete provision was in every draft. According to the affidavit of Brian Leftwich, Haeuser's attorney, the noncompete language resulted from Rellstab's suggestions. Haeuser claimed Rellstab was eliminated from ownership of stock because he did not want to incur personal liability. Haeuser had no background in the coffee industry and needed Rellstab and the others to remain with the company. He insisted that the contract contain a clause that Kearney, Jackson and Rellstab would work full-time. Rellstab received $20 for his stock and an employment contract and did not incur any liability. Rellstab, who had been a 10% shareholder, president and chief executive officer, was senior vice-president of warehousing under the new contract.
*746 Edward Keller said he was hired to be executive vice-president of general operations in January, 1987 by Rellstab, Jackson and Kearney. Keller became Rellstab's superior after the agreement in May, 1987. He had known Rellstab since 1969. Keller felt that Rellstab had completely recovered from the stroke but would not carry out personnel changes in order for the company to survive. Keller had to fire about twenty employees. He often consulted Gene Toca, warehouse supervisor, instead of Rellstab.
Keller said he avoided expressing concern about Rellstab because Rellstab had hired him and he had respect and sympathy because of his health problems. However, on two or three occasions Haeuser spoke to Keller about avoiding Rellstab. Matters were resolved verbally. Keller conceded that Rellstab's job as vice-president of warehousing was a new position after the May, 1987 agreement. Gene Toca remained manager of the warehouse under Rellstab which created another level of management. Keller conceded that "things were very, very unclear about who did what in January 1987,...." Keller could not explain Rellstab's duties because Toca continued to manage the warehouse. His response was that Toca was a weak manager and the company expected Rellstab to concentrate on the warehouse.
Rellstab said he returned to work after the stroke on June 15, 1987. He was moved to a small office and nobody set out parameters for his new job. Haeuser made no effort to include him in management decisions. Rellstab's work hours between May 20, 1987 and May 20, 1988 were 8:00 a.m. to between 1:30 and 3:30 p.m. When he was president, chief executive officer and managed four corporations with six divisions, he left work about 4:30 or 5:00 p.m.
Rellstab denied that he received any complaint from Keller or Haeuser about his hours or any notice that his work was unsatisfactory, or that he refused Keller's orders. Rellstab said that he was manager and his "time schedule might have been different...." Rellstab said the warehouse division was profitable during that first year, the only Neeb-Kearney division that was consistently profitable.
Keller said the company experienced a crisis situation and Rellstab did not work to his satisfaction from June, 1987 through March, 1988. Keller never recommended to Haeuser that Rellstab be fired, nor did he tell Rellstab that his job was in jeopardy. He felt Rellstab knew that they did not agree on how to run the business, in particular "about what had to be done and about getting it done quick."
There is nothing to document Rellstab's alleged poor performance. Keller said he avoided criticizing Rellstab to Haeuser. He was not aware of Rellstab's hours and was not informed prior to Rellstab's termination, after which Toca was promoted to vice-president of warehousing.
Haeuser said he terminated Rellstab in May, 1988 due to his poor performance and failure to work full-time. Haeuser learned from Keller that Rellstab was not properly managing his area and Keller had to bypass Rellstab in order to run the company efficiently. In May, 1988 Haeuser, Rellstab and others had a meeting and Haeuser told Rellstab of their dissatisfaction. Rellstab claimed surprise by Haeuser's complaints. Haeuser conceded that he never confronted Rellstab prior to that time.
Haeuser arranged another meeting with Kearney and Rellstab. Haeuser said they informed Rellstab that he was not performing or working on a full-time basis. They offered Rellstab $30,000 for the second year and "he was set up with that." According to the contract, Rellstab's salary from May, 1987 to May, 1988 was $60,000 and not less than $30,000 for the second year. Rellstab responded that he wanted to be paid three more months (June, July, August, 1988) at $5,000 per month salary and then would accept the additional year at $30,000 with his pay to end in September, 1989. Rellstab was paid $5,000 a month for June through August, 1988 and then $2,500 per month for the next twelve months although he was not going to the office. In company records he was listed *747 as a consultant and his checks were not payroll checks (with deductions).
According to Rellstab, the $30,000 salary (the minimum possible under the contract for the second 12 month period) was offered for work as a consultant. Haeuser gave him the three months at $5,000 per month when he complained of lack of notice. Rellstab felt he was treated unfairly, but Kearney told him that Haeuser would pay nothing if he did not accept the offer. After September, 1989 Haeuser made no other employment offer.
Counsel confronted Haeuser with an interrogatory in which he stated that Rellstab was terminated because of his inability to perform "caused by a series of strokes which he suffered in early 1988." Haeuser stated that he was confused as to the exact date of the stroke. He testified Rellstab's stroke occurred in April, 1987 prior to the agreement. Haeuser said Rellstab was fired because "his performance hopefully was affected by the results of the stroke." He could not explain why Rellstab was paid for an additional year if Rellstab was not living up to the agreement, or why Rellstab was paid if he was fired for not doing his job. He said Rellstab negotiated the additional money and the company wanted to be fair.
In November, 1989 Rellstab began discussions with Allen Colley, Dupuy's president, about employment. Rellstab made it clear to Colley that he would not contact potential customers or deal with rates. Rellstab was employed to help with the plan to move to a new warehouse. Rellstab denied soliciting customers for Dupuy or that he disclosed rate information about Neeb-Kearney. Rellstab stated that his knowledge of trade secrets resulted from 27 years in the business. Rellstab's job was to read and study proposals by machinery manufacturers and engineering firms and to analyze brochures. He worked daily from 8:00 to 10:00 a.m. at Dupuy for $9,360 per year, the amount he could earn without affecting social security benefits. Rellstab denied that he competed with Neeb-Kearney. Colley's affidavit corroborated that Rellstab was not involved in customer solicitations or rate setting.
The commissioner heard extensive testimony by the parties and reviewed a comprehensive record of depositions and exhibits. He found there was no substantial advertising of Rellstab by Dupuy sufficient to trigger the exception of La.R.S. 23:921. The commissioner concluded that Rellstab's consulting job did not constitute participation in Dupuy's business sufficient to violate the noncompete provision and that Neeb-Kearney did not show any impairment as a result.

LAW AND ANALYSIS
Louisiana has consistently had a strong public policy against an employment contract which prohibits an employee from competing with a former employer. Orkin Exterminating Company v. Foti, 302 So.2d 593 (La.1974); Matter of Standard Coffee Service Company, 499 So.2d 1314 (La.App. 4th Cir.1986), writ denied 501 So.2d 232 (La.1987). La.R.S. 23:921, applicable at the time that the agreement was signed on May 20, 1987 (major revision occurred in Acts 1989, No. 639, Section 1), provided:
No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or provisions thereof containing such agreement shall be null and unenforceable in any court, provided that in those cases where the employer incurs an expense in the training of the employee or incurs an expense in the advertisement of the business that the employer is engaged in, then in that event it shall be permissible for the employer and employee to enter into a voluntary contract and agreement whereby the employee is permitted to agree and bind himself that at the termination of his or her employment that said employee will not enter into the same business that employer is engaged *748 over the same route or in the same territory for a period of two years.

ENFORCEABILITY OF PROVISION

(Neeb-Kearney's Error No. 1)

(Rellstab's Error No. 1)

ADVERTISEMENT
The purpose of the exception built into the statute is to protect an employer only where he has invested substantial sums of money in special training of the employee or in advertising the employee's connection with his business or company. An employer is to be protected if he "extensively advertises a particular employee as the man to go to...." Orkin Exterminating Company, 302 So.2d at 597. Substantial expenses do not include normal administrative and supervisory expenses, access to training manuals and technical bulletins in a particular field, or any training primarily beneficial to the employer. The exception also does not apply if the employer received the benefit of its investment before the employee was terminated. Education For Living Seminars v. Leone, 558 So.2d 250 (La.App. 1st Cir.1990), writ denied 559 So.2d 1378 (La.1990); Daigle v. Standard Coffee Service Company, 479 So.2d 469 (La.App. 1st Cir.1985).
It is clear that Rellstab did not learn the business during his one year as senior vice-president of warehousing from 1987 to 1988. His many years of experience in the coffee business gave him his specialized training and expertise, the asset which he brought with him to Neeb-Kearney. Haeuser authorized the $18,000 brochure for the Jackson-Kearney group because of its marketing needs. Rellstab's picture was included with his quote relating to his "37 years of direct experience in this business." A smaller picture was part of an insert relating to "the coffee specialists." The brochure, however, also included pictures and statements by Haeuser, Kearney, Jackson, and Keller. The brochure did not focus on Rellstab; rather, its purpose was "to show how the company was going to be functioning" and to show what the "company had to offer."
The commissioner stated that the advertising of Rellstab was "a printed flyer with the defendant's picture in it." The commissioner concluded that "[n]either the scope of the advertisement" nor "the aggrandizement of Mr. Rellstab" was so significant that it triggered the exception to the statute. That finding was adopted by the trial court and was correct.

SALE OF BUSINESS
The reason for our public policy which disfavors noncompete agreements is the basic right of an individual to better himself in our free society. The policy is based on the fact that there is "the disparity in bargaining power, under which an employee, fearful of losing his means of livelihood, cannot readily refuse to sign an agreement which, if enforceable, amounts to his contracting away his liberty to earn his livelihood in the field of his experience except by continuing in the employment of his present employer." Orkin Exterminating Company, 302 So.2d at 596, quoting National Motor Club of Louisiana, Inc. v. Conque, 173 So.2d 238, 241 (La.App. 3rd Cir.1965), writ denied 247 La. 875, 175 So.2d 110 (1965).
When a person (shareholder) sells a business and remains an employee after the sale, an agreement not to compete may be enforced against him. Target Rental Towel, Inc. v. Byrd, 341 So.2d 600 (La.App. 2d Cir.1977). The concept is to protect those who are in a poor bargaining position, therefore the form of the agreement and the label tacked to the individual (employee, partner, shareholder) are immaterial.
Pertinent inquiry includes whether all concerned are bound equally to the covenant; whether the terms are fair to each party in all respects; the amount of control over the individual; if the person is subject to the wishes of a controlling majority; the circumstances under which the contract was executed; the effect on the individual's right to engage freely in his occupation after the association terminates.
*749 Winston v. Bourgeois, Bennett, Thokey & Hickey, 432 So.2d 936, 940 (La.App. 4th Cir.1983). See also Standard-Crescent City Surgical Supplies, Inc. v. Mouton, 535 So.2d 1301 (La.App. 5th Cir.1988).
Mere ownership of stock in a company cannot justify ignoring the public policy enunciated in La.R.S. 23:921. The status of a minority shareholder subject to the decision of a corporate board of directors or the majority shareholders does not constitute sufficient ownership to defeat the statute. The right to control is one of the most important tests in determining whether one is truly an employee or an owner of a business. See Target Rental Towel, Inc., 341 So.2d at 600. If the party is a partner and the partnership agreement applies equally to all partners and is fair, the agreement does not violate La.R.S. 23:921. McCray v. Blackburn, 236 So.2d 859 (La. App. 3rd Cir.1970), writ denied 256 La. 845, 239 So.2d 355 (1970).
Rellstab was not an ordinary employee. He was president and chief executive officer involved in all management decisions and not subject to anyone's control prior to the agreement with the Haeusers. He owned only 10% of the stock. It is not clear how company decisions were made by Kearney, Jackson and Rellstab; however, it is clear that Rellstab, whose reputation was an integral part of the May 20, 1987 transaction, did not receive the same benefits. He sold 20 shares of stock for $20, but was not relieved of personal liability on bank loans like Jackson and Kearney. The $350,000 credit line permitted the company to survive. Rellstab's benefit was his employment contract which contained the noncompete agreement.
Although Rellstab participated in the negotiations prior to his stroke in April, 1987, he stated that it was difficult to sign his name in May, 1987. Because his expertise was in coffee warehousing, the noncompete provision prevented him from engaging in his occupation when Neeb-Kearney terminated his employment.
Rellstab negotiated the contract, chose to sell his stock rather than sign warranties, and benefited from his employment contract. Accordingly, he is bound by the clause.

TERMINATION FOR CAUSE

(Neeb-Kearney's Error No. 2)

(Rellstab's Error No. 2)
Neeb-Kearney argues that Rellstab was terminated for cause because he did not work full-time and his job performance was poor. It contends that Rellstab worked until 4:30 p.m. prior to the May, 1987 agreement, but only until 2:30 p.m. subsequently. Neeb-Kearney submits that Rellstab admitted that he did not work full-time.
Rellstab testified that he left the office by 2:30 p.m. daily after his work was finished. He noted that prior to May, 1987 he was chief executive officer and president of Neeb-Kearney, but afterward his sole responsibility was the warehouse. He said it was not necessary to work until 4:30 p.m. in order to complete his duties (which had never been set out by Haeuser, Keller or any representative of Neeb-Kearny). Rellstab's stroke in April, 1987 caused him to miss work until June 15, 1987.
In answer to an interrogatory, Neeb-Kearney indicated that Rellstab was terminated because he was incapable of performing his responsibilities due to a series of strokes. At trial Haeuser never mentioned Rellstab's stroke until confronted with the question. He then testified that his reasons for terminating Rellstab were lack of performance and failure to adhere to the agreement to work full-time. When confronted with his interrogatory response, Haeuser acknowledged that Rellstab had a serious stroke prior to the agreement. He could not explain why Neeb-Kearney was willing to pay Rellstab an additional $45,000 after he was terminated because he did not work adequately from May, 1987 to May, 1988.
Rellstab responds that he was never told that his performance was inadequate and the record supports that contention. Neither Haeuser nor Keller told Rellstab that they disapproved of his job performance. *750 Keller only testified that Rellstab would not carry out personnel changes, yet no employee was mentioned. Rellstab testified that he "never refused to do anything." He said his time schedule may have differed from Keller's timetable.
Keller stated that he avoided expressing concerns about Rellstab because of respect. Although Keller claimed that he and Haeuser had three discussions about Rellstab, he did not relay that information to Rellstab. Keller conceded that the vice-president of warehousing was created after the May 20, 1987 agreement. He also conceded that "things were very, very unclear about who did what in January, 1987...."
Although the commissioner erroneously stated it was "unnecessary to make a finding concerning whether the defendant was terminated for `cause,'" he did make factual findings relating to Neeb-Kearney's reasons for terminating Rellstab and stated:
The testimony of the remaining personnel with the plaintiff was to the effect that the defendant spent less daily time than previously when he was president, but did not reveal any demands that defendant spend more time on the job. The defendant stated that he generally was present daily from 8:00 p.m. [sic] until the day's work was concluded around 1:30 to 2:00 p.m. After expiration of the first year Mr. Hauser [sic] for the new ½ stock ownership testified that it was not contemplated that the defendant come in at all. A limited number of calls were made to the defendant during the second year.
Another complaint regarding defendant's job performance related to contact with other personnel below the defendant which was accomplished directly by the defendant's supervisors. This managerial chain of command seemed to exist but its use was not mandated by the plaintiff. Its disuse by the defendant may have been irritating to plaintiff's supervisory personnel, but there was no showing of any particular incident or incidents which arose to the extent that verbal or written orders transmitted were not fulfilled.
* * * * * *
The consultant's job taken by Mr. Rellstab pays him only $9,360.00 per year which dovetails with the maximum permissible earnings while collecting, as he does now, social security. After expiration of the time for which money was paid, no further employment was offered to the defendant as required by the contract. While there does seem to be an area of agreement lacking in the job, tenure and pay for the remaining three years, it is fair to observe that no efforts were made by the plaintiff to offer anything to Mr. Rellstab. For Mr. Rellstab to seek employment after this failure was not only foreseeable but was avoidable [sic].
We conclude that the commissioner was not manifestly erroneous.[2] The commissioner's factual findings and our review of the record convince us that Neeb-Kearney did not prove that it terminated Rellstab for cause. The trial court was correct in relying upon the commissioner's report.
Pursuant to Section 13.01(C) of the agreement, Rellstab, a shareholder terminated without cause, may compete with the company. The trial court correctly recalled the preliminary injunction and dismissed Neeb-Kearney's petition for a permanent injunction.

PRELIMINARY INJUNCTION AND RELLSTAB'S AWARD FOR WRONGFUL ISSUANCE
Rellstab claims he is entitled to damages and attorney's fees because of the wrongful issuance of the preliminary injunction. He states that Neeb-Kearney consolidated his rule to dissolve the injunction which requested damages and fees with its exceptions *751 to the commissioner's report. At the hearing the trial court only allowed argument on the exceptions and took no evidence on the issue of damages. According to Rellstab the court stated it would not take such evidence until it had ruled on the merits of the permanent injunction. Rellstab was not allowed to offer proof of damages.
Neeb-Kearney argues that Rellstab did not produce evidence of damages and attorney's fees. It contends the trial court was cognizant of Rellstab's motion to dissolve (fixed for hearing the same day as its exceptions) when it ruled on the permanent injunction and chose not to award damages.
The record indicates that on September 13, 1990 Rellstab filed a rule for a stay of preliminary injunction after the August 17, 1990 commissioner's report recommended dismissal of Neeb-Kearney's permanent injunction petition. On August 17, 1990 Neeb-Kearney filed exceptions to the report and on October 10, 1990 moved to consolidate Rellstab's motion to stay with its exceptions. Rellstab filed his rule to dissolve the injunction which requested damages up to $20,000 and attorney's fees up to $50,000 on October 18, 1990. His rule to increase security was not filed until October 29, 1990. These two rules could not have been consolidated pursuant to Neeb-Kearney's October 10, 1990 motion.
Rellstab's request for damages and attorney's fees was evidently not considered by the trial court. His appeal on that issue is premature. Rellstab is entitled to a hearing on his request for damages and attorney's fees for wrongful issuance of an injunction.
The judgment recalling the preliminary injunction and denying the permanent injunction is affirmed. Rellstab's appeal regarding damages and attorney's fees for the wrongful issuance of the preliminary injunction is premature and can be re-urged after a trial court hearing and judgment.
AFFIRMED.
PLOTKIN, J., dissents with written reasons.
PLOTKIN, Judge, dissenting.
I respectfully dissent.
Plaintiff Neeb-Kearney & Co., Inc. appeals the trial court's refusal to enforce a valid non-competition agreement with defendant William F. Rellstab.
The majority correctly concludes that the May 20, 1987 "Stock Purchase Agreement," which contained the non-competition agreement, is valid. Rellstab received substantial financial benefits as a result of this transaction, which he actively negotiated as a stockholder and officer of Neeb-Kearney. In return for his voluntary sale of all of his 20 shares of stock in this bankrupt company, he was relieved of all personal liability for the company's debts and guaranteed employment until the age of 65. The record contains no evidence that he lacked capacity to understand and execute the agreement. The benefits he received were, under the existing financial circumstances, fair and equitable to Rellstab, as well as to Jackson and Kearney, who continued to be personally liable for the company's debts.
I disagree with my colleagues on the issue of "termination for cause." The evidence is unambiguous that Neeb-Kearney had just cause to terminate the defendant's employment.
Prior to the May 1987 agreement, Rellstab had been employed by Neeb-Kearney for 29 years and had served as its president and CEO, as well as being a shareholder. He worked from 8 a.m. to 4:30 p.m. daily and was an experienced senior manager, knowledgeable in all aspects of the coffee business, including import, distribution, and sales.
Under the May 1987 agreement, Rellstab was paid $60,000 per year to serve as vice-president in charge of warehousing. His immediate supervisor was Edward Keller, who was originally hired by Rellstab while he was president. Rellstab unquestionably understood his duties without being told by any of his supervisors because of his expertise and experience in the coffee business. He admitted he was an employee in the chain of command. He defined his duties as follows:

*752 The manager of the warehouse is to meet the goals and objectives of the warehouse, to provide the support to the men who actually do the work to get the job done, to monitor their performance, to help solve their problems, to foresee problems and avoid them, a typical manager's job, to plan, to execute and to monitor.
The plaintiff established multiple just causes for plaintiff's termination. It is undisputed that Rellstab worked from 8 a.m. to 1:30 or 2 p.m., then left the premises, claiming that his work was finished. He denied that he left early because of his health. This conduct violated the clear terms of the agreement, which required full-time employment, as the following excerpt from the contract shows:
[The employment provisions] apply only if the employee is working full time for the Company, and the salary shall not be payable in the event of disability of the employee, inability of the employee to work, or if, in fact, said employee does not work full time for any reason.
Other grounds for discharge, which were proven by the plaintiff, included the defendant's failure to complete specific goals assigned to him, such as the implementation of a new coffee inventory procedure. This task was assigned to Rellstab's subordinate, Toca, who completed the objective. Rellstab also refused to fire certain employees in order to make the insolvent company more efficient. Rellstab admitted that he did not perform his duties to Keller's satisfaction, saying that he may have had a "different timetable."
The evidence shows that the defendant was not performing the duties for which he was employed. Thus, the plaintiff had just cause to terminate his employment. The jurisprudence in Louisiana has established the following:
[I]f a person is not achieving the results for which he was hired, whether it be due to incompetency, inefficiency or some other cause within his control, the employer may discharge him from his employ.
Georesearch, Inc. v. Morriss, 193 F.Supp. 163, 177 (W.D.La.1960), aff'd Morriss v. Georesearch, Inc., 298 F.2d 442 (5th Cir. 1962), citing Wells v. Sherrill Hardwood Lumber Co., 151 La. 1081, 92 So. 706 (La. 1922) and Evans v. Delta By-Products, Inc., 52 So.2d 593 (La.App.Orl.Cir.1951). The Georesearch case was very similar to the case at hand because the employee involved obviously understood his duties, but was unable to obtain the results anticipated by the employer. 193 F.Supp. at 177. The court stated as follows:
Whether this was due to incompetency or inefficiency or other cause is difficult to say, but it obviously offered serious enough ground of complaint on the part of [the employer] ... to justify the dismissal of its employee.
Id.
In reaching its conclusion that the termination of Rellstab's employment occurred without cause, the majority also relies on two additional factors. The majority notes both the fact that the plaintiff paid the defendant $45,000 over 15 months after the termination, and the fact that the defendant did not receive any warning or notice that his job performance was inadequate prior to termination. Both issues are legally irrelevant; additionally, they have a rationale basis.
Rellstab was respected by the new owners and managers because of their long-term personal friendships, because of his 30-year association with the company as an owner and CEO, and because of his age and health. He was entitled to humane and decent treatment by the company as he approached retirement. The plaintiff sought to terminate the employment relationship with dignity and kindness because of the defendant's special relationship to the company.
Just cause for dismissal of an inadequate employee subject to an employment contract is not dependent upon the employee's right to notice that his work is inadequate prior to dismissal. In Louisiana, employees may generally be fired for any reason, or for no reason, in the absence of an employment contract. La.C.C. art. 2747; Brannan *753 w. Wyeth Laboratories, Inc., 526 So.2d 1101, 1103 (La.1988). Therefore, any right to continued employment is dependent solely on the terms of an employment contract. It follows that unless the employment contract in question provides a right to notice of inadequate performance prior to termination, no such right exists. This principle has previously been recognized in Morris v. Manufacturers' Enterprises, Inc., 442 So.2d 582 (La.App. 1st Cir.1983), where the court found that the employee's failure to perform constituted just cause for his dismissal despite both the existence of an employment contract and the fact that the employee claimed that "no one complained to him about the quality of his work." Id. at 584.
Additionally, the company's decision to pay Rellstab for the remainder of his contract does not affect the just cause inquiry. The payment of $5,000 for June, July, and August, and $2,500 for the next 12 months, conforms to Rellstab's request for payment until he reached the age of retirement. The fact that the company was willing to pay these monies, regardless of the reason, is not evidence that the termination was not based on just cause. In fact, it is irrelevant to the issue of just or unjust cause. An employer has the legal right to terminate an employee for just cause, then pay separation benefits without regard to the reasons for termination. There is nothing inconsistent in Neeb-Kearney's actions in this case, especially when Rellstab's special relationship with the company is considered. The majority improperly uses this fact, and the fact that Rellstab received no notice of his inadequate performance prior to his dismissal, to find that his dismissal was somehow not prompted by just cause. As the above discussion shows, that conclusion is illogical and unmerited. I would reverse the trial court's decision on this issue.
Finally, I believe that Rellstab's employment with Dupuy after his dismissal by Neeb-Kearney was in direct violation of the non-competition clause in the agreement.[1] The record demonstrates that Rellstab performed multiple duties for Dupuy, Neeb-Kearney's main competitor. Those duties included designing and installing a new coffee blending and handling system for a new facility, reviewing proposals for coffee systems, and corresponding with suppliers, engineering firms, and machinery companies. Dupuy utilized Rellstab's knowledge and experience to engage in direct competition with Neeb-Kearney, all to the detriment of the plaintiff. See Ingram, Corp. v. Circle, Inc., 188 So.2d 96 (La.App. 4th Cir.), writ refused 249 La. 712, 190 So.2d 232 (La.1966).
For the reasons stated above, I dissent with the majority decision affirming the trial court judgment. I would reverse the judgment, issue the injunction, and deny Rellstab's request for damages and attorney's fees for wrongful discharge.
NOTES
[1] There is disagreement as to whether depositions were before the court when it issued the preliminary injunction. At the hearing for a permanent injunction the trial court accepted counsel's offer of the preliminary hearing record and allowed opposing counsel to introduce portions or entire depositions that may have been excluded. The commissioner indicated the preliminary injunction documents were part of the record.
[2] We take issue with the commissioner's subsequent conclusions that Rellstab's consulting job with Dupuy did not constitute engagement in the generalized business of Neeb-Kearney (Neeb-Kearney's error no. 3) (Rellstab's error no. 3). We pretermit discussion of Rellstab's unpersuasive argument that the noncompete agreement ended in May, 1990 (Rellstab's error no. 4).
[1] The majority implies that it agrees with this statement in footnote 2 on page 750, but pretermits analysis of this issue.