980 So.2d 89 (2008)
SOUTH EAST AUTO DEALERS RENTAL ASSOCIATION, INC.
v.
EZ RENT TO OWN, INC.
No. 2007-CA-0599.
Court of Appeal of Louisiana, Fourth Circuit.
February 27, 2008.
*91 Harry Rosenberg, Christopher K. Ralston, Jaclyn C. Hill, Phelps Dunbar L.L.P., New Orleans, LA, for Plaintiff/Appellant.
Coleman D. Ridley, Jr., L. Etienne Balart, Jennifer F. Kogos, Jones Walker Waechter Poitevent Carrere & Denegre, LLP, New Orleans, LA, for Defendant/Appellee.
(Court composed of Judge MICHAEL E. KIRBY, Judge DAVID S. GORBATY, Judge ROLAND L. BELSOME).
ROLAND L. BELSOME, Judge.
Plaintiff-Appellant South East Auto Dealers Rental Association, Inc. (hereinafter "SEADRA") appeals the trial court's partial denial of a preliminary injunction filed against Defendant-Appellee, EZ Rent to Own, Inc. (hereinafter "EZ Rent"). For the reasons that follow, we reverse and remand.

FACTS AND PROCEDURAL HISTORY
In July 2005, Plaintiff-Appellant SEADRA, an association of rent-to-own automobile dealers, entered into a license agreement with EZ Rent. SEADRA had created and developed a system whereby it would train and assist automobile dealers with respect to how to start up and maintain the rent-to-own or rent-with-option-to-purchase programs, including repossession of automobiles, marketing, licensing, insurance coverage and defense, and so forth. EZ Rent paid an annual license fee of $295.00 to SEADRA and a monthly fee of $20.00 for each vehicle leased to EZ Rent through a consumer contract that had been provided to EZ Rent by SEADRA as part of the implementation of the system. Thus, the agreement between the parties essentially provided for SEADRA to assist the licensee in all aspects of implementing the rent-to-own system, in exchange for certain agreements by EZ Rent, including the agreement not to compete with or solicit customers of SEADRA or SEADRA's licensees within two years of termination of the license agreement. Specifically, the noncompete portion of the License Agreement provided, in pertinent part:
IX. Non-Competition.
* * *
9.2 Licensee acknowledges that the methodology of marketing and operation of the SEADRA System is unique and distinctive and has been developed by SEADRA at great effort, time and expense. Licensee has regular and continuing access to valuable confidential information and training regarding the SEADRA System, and Licensee recognizes its obligation to promote and develop the SEADRA System. Accordingly, during the Term of this Agreement, including any Extension Period hereof, and for two (2) years following the expiration or earlier termination of this Agreement, for any reason whatsoever, *92 Licensee agrees on behalf of itself and all persons and entities included in the definition of Licensee for purposes of this Article IX that:
i. Licensee shall not, without the SEADRA's prior written consent, either directly or indirectly, for itself or through, on behalf of, or in conjunction with any other individual, partnership, LLC, corporation or other entity, own maintain, engage in, have any interest in, or perform any service similar to those to be performed by SEADRA under this agreement relating to the SEADRA system or any similar system relating to the "Rent with Option to Purchase" of automobiles, for any car rental business which is located within the County, Parish or metropolitan area in which the Licensee is located, to wit:
STATE: LA
Municipality and/or Parish/County of business: Vernon
ii. The Licensee shall not either directly or indirectly, for itself or through, on behalf of, or in conjunction with any individual, partnership, limited liability company, corporation or any other entity, divert or attempt to divert any customer or account of the Licensee, SEADRA or any other Licensee of SEADRA to any competitor of SEADRA, by direct or indirect inducement or otherwise.
The agreement further provided for a one-year term, which would be automatically extended each year for another twelve months unless EZ Rent issued notice in writing to SEADRA no less than ninety days prior to the end of the term. Additionally, in Paragraph 11.2, the agreement included a provision which stated that in the event of EZ Rent's default, SEADRA could seek injunctive relief, and that "the parties hereby acknowledge[ed] that irreparable injury will be suffered by SEADRA in the event of any breach of this Agreement" by EZ Rent.
In May of 2006, EZ Rent ceased making payments to SEADRA for the monthly fees it owed pursuant to the license agreement. EZ Rent submits that the reason for this was because it was dissatisfied with SEADRA's services and that EZ Rent had been unsuccessful in its attempt to renegotiate the license agreement. EZ Rent further argues that because of EZ Rent's refusal to renew the agreement as proposed by SEADRA, that SEADRA in fact terminated the agreement. SEADRA subsequently filed a petition for damages and injunctive relief. On February 5, 2007, the trial court conducted a hearing on the petition for preliminary injunction.
The trial court initially deferred ruling in the matter so that it could review Louisiana Smoked Products, Inc. v. Savoie's Sausage and Food Products, Inc., 96-1716 (La.1997), 696 So.2d 1373.[1] The court subsequently *93 determined that Louisiana Smoked Products was not analogous to the SEADRA matter because SEADRA "was in the business of providing support services to companies and/or businesses whose goal was to enter into `the rent to own' or `rent with the option to purchase' automobile business by providing these companies with forms, methods, and procedures to operate said business," whereas "EZ Rent to Own, Inc., was in the business of actually operating a `rent to own' and/or `rent with the option to purchase' automobile business." Thus, the trial court concluded, "EZ Rent was not performing similar services to SE[A]DRA in violation of the non-compete clause of the licensing agreement," and denied the preliminary injunction.
The court further ordered, however, that EZ Rent cease and desist its use of SEADRA's tradename and service mark, return any and all of SEADRA's proprietary materials and information, and delete any and all of SEADRA's proprietary materials and information from any and all of EZ Rent's computer systems. This appeal followed.
STANDARD OF REVIEW
To obtain a preliminary injunction, a petitioner must demonstrate that he will suffer irreparable injury, that the petitioner is entitled to the relief sought, and must make a prima facie showing that he will likely prevail on the merits of the case. Saunders v. Stafford, XXXX-XXXX, p. 5 (La. App. 4 Cir. 1/11/06), 923 So.2d 751, 754. A "[r]eview of the granting or denial of a preliminary injunction is whether the trial court committed an error of law or made a factual finding which is manifestly erroneous or clearly wrong." Id.; see also Yokum v. Court of Two Sisters, Inc., XXXX-XXXX, p. 3 (La.App. 4 Cir. 11/21/06), 946 So.2d 671, 673.
Where one or more legal errors interdict the trial court's fact-finding process, however, the manifest error standard becomes inapplicable, and the appellate court must conduct its own de novo review of the record. See, e.g., Evans v. Lungrin, 97-0541, 97-0577, pp. 6-7 (La.2/6/98), 708 So.2d 731, 735. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Id. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. Id. Because we find that under these facts, the trial court committed legal error in partially denying the request for injunctive relief, we review the record de novo.
DISCUSSION
Assignment of Error # 1
In its first assignment of error, Appellant SEADRA submits that the trial court erred in refusing to enforce the commercial contract, which included a valid noncompete agreement prohibiting EZ Rent from directly or indirectly competing in the rent-to-own business or a similar system of renting automobiles with the option to purchase.
Upon a careful review of the record, we find that the instant case is analogous to Louisiana Smoked Products, supra n. 1. In that case, the Louisiana Supreme Court determined that a commercial contract and noncompete clause *94 between Savoie's and L.S.P., the two corporations, was valid. In reaching its decision, the Louisiana Supreme Court first examined the legislative history behind the state's first noncompetition statute, originally enacted in 1934, currently La. R.S. 23:921. Id. at 1376. La. R.S. 23:921(A)[2] provides as follows:
(1) Every contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, except as provided in this Section, shall be null and void.
(2) The provisions of every employment contract or agreement, or provisions thereof, by which any foreign or domestic employer or any other person or entity includes a choice of forum clause or choice of law clause in an employee's contract of employment or collective bargaining agreement, or attempts to enforce either a choice of forum clause or choice of law clause in any civil or administrative action involving an employee, shall be null and void except where the choice of forum clause or choice of law clause is expressly, knowingly, and voluntarily agreed to and ratified by the employee after the occurrence of the incident which is the subject of the civil or administrative action.
The Court further noted that prior to its amendment in 1989, La. R.S. 23:291 provided:
No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or provisions thereof containing such agreement shall be null and unenforceable in any court, provided that in those cases where the employer incurs an expense in the training of the employee or incurs an expense in the advertisement of the business that the employer is engaged in, then in that event it shall be permissible for the employer and employee to enter into a voluntary contract and agreement *95 whereby the employee is permitted to agree and bind himself that at the termination of his or her employment that said employee will not enter into the same business that employer is engaged over the same route or in the same territory for a period of two years. [Emphasis added].
Louisiana Smoked Products, 696 So.2d at 1377.
Next, the Court considered whether the amended language of La. R.S. 23:291(A) was intended to apply solely to employment contracts:
In the instant case, the language of the La. R.S. 23:921(A) is susceptible to different meanings. Generally, Title 23 of the Revised Statutes governs employment situations and relationships. The fact that this statute falls under Title 23 could reasonably give rise to the presumption that, unless otherwise indicated, the prohibition of every contract which contains a noncompetition agreement means every employment contract or every contract that is, to some extent, essentially of an employment nature. Legislation is a solemn expression of legislative will. Our interpretation of a law is primarily the search for the legislature's intent. [Hutchinson v. Patel, 93-2156 (La.1994), 637 So.2d 415,] 420. Because the statute is susceptible to different meanings, the court will examine the context in which the 1989 amendment occurred and the text of the law as a whole to determine whether the legislature intended La. R.S. 23:921 to be broadly construed to apply to relationships other than essentially employer-employee relationships which do not fall within the statute's delineated exceptions. Specifically, the court must determine whether the prohibition of noncompetition agreements applies to contracts executed by two corporations on equal footing.
Id. at 1379 (emphasis added).[3]
The Court ultimately held that La. R.S. 23:921 was not intended to protect corporations on equal footing from a bad *96 bargain. Id. at 1381. With regard to the language of La. R.S. 23:291, the Court stated that "[i]t is inconceivable that the legislature would uphold noncompetition agreements,[4] subject to certain restrictions, executed between an employer and employee when its original intent and longstanding policy was to forbid such agreements in employment situations, yet, forbid the execution of such agreements executed between two corporations altogether, allowing for no exceptions under any circumstances." Id. at 1379-80. The Court further held that:
The noncompetition clause executed between L.S.P. and Savoie was fair to each party in all respects: there was no disparity in the corporations' bargaining power, both parties were equally bound to the noncompetition clause, neither party had control over the other, and the prohibition of directly competing with each other's business activity was reasonably limited in duration to three years after termination of the agreement. Additionally, both L.S.P. and Savoie benefited from the contract. . . . At the time both parties signed the agreement, each consented to the noncompetition clause and were equally bound to the terms therein. After reaping the benefits of other provisions in the contract, Savoie now challenges the validity of the noncompetition clause, evidently, in an effort to avoid fulfilling its end of the bargain. This court is not inclined to invalidate the noncompetition clause under these circumstances.
Id. at 1380 (emphasis added)(internal citations omitted). Thus, the Court found that given these facts, prohibiting L.S.P. and Savoie from executing a noncompetition agreement in the commercial contract would be "[i]nterpreting the statute in a manner which is consistent with logic and the presumed fair purpose and intention of the legislature in passing it" and likewise "would unduly infringe on the parties' freedom to contract and the corresponding obligations to perform or abstain from some performance." Id. Finally, in addressing public policy concerns, the Court held that "neither the facts, nor the nature of L.S.P. and Savoie's relationship, support a finding that the noncompetition clause contained in the contract executed between the two parties ha[d] a deleterious effect on the public" and that the clause likewise did not violate public policy. Id.
We similarly find that the noncompetition clause in the instant case was valid and that La. R.S. 23:291 is inapplicable under these circumstances. First, like the agreement in Louisiana Smoked Products, the commercial contract and noncompetition agreement between SEADRA and EZ *97 Rent was fair to each party: the parties did not have an employer-employee relationship; there was no disparity in bargaining power between the two corporations; at the time of its execution, both parties consented to the agreement in its entirety; both parties derived monetary benefits from the agreement; and the noncompetition provision was reasonably limited in duration to a period of two years and geographically limited to Vernon Parish. See Id.
Furthermore, it is well-settled that parties have freedom to contract for any object that is lawful, possible, and determined or determinable. La. C.C. art. 1971; Louisiana Smoked Products, 696 So.2d at 1380. This freedom of contract "signifies that parties to an agreement have the right and power to construct their own bargains." Louisiana Smoked Products, 696 So.2d at 1380-81 (citing Blake D. Morant, Contracts Limiting Liability: A Paradox with Tacit Solutions, 69 Tul. L.Rev. 715 (1995)). The only exceptions to this rule are where the government or the state has restricted the parties' right to contract because the proposed bargain has a deleterious effect on the public or otherwise violates public policy. Louisiana Smoked Products, 696 So.2d at 1381 (citing Morant, supra, at 718). We find nothing in the record or in the relationship between SEADRA and EZ Rent which evidences that the noncompete agreement had a deleterious effect on the public or somehow violated public policy.[5]
EZ Rent submits that even if the noncompete agreement is enforceable, the partial denial of the request for injunctive relief should nonetheless be upheld because SEADRA is not performing similar services to EZ Rent and is thus not entitled to the relief sought because the two parties are not competitors. EZ Rent argues that it operates as a dealer, while SEADRA provides the methods and procedures for licensing and developing packages for dealers who are engaged in the rent-to-own or rent-with-option-to-purchase business.
We find that EZ Rent's argument lacks merit. The language in Paragraph 9.2(i) of the License Agreement plainly disallows EZ Rent from "directly or indirectly" engaging in or performing any service similar to the SEADRA system "or any similar system relating to the `Rent with Option to Purchase' of automobiles . . ." It is well-settled that "[w]here the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation *98 may be made in search of the parties' intent." La. Civ.Code art. 2046. EZ Rent has asserted that it is a rent-to-own dealer within both the rent-to-own and rent-with-option-to-purchase industry. Thus, EZ Rent is engaging in an activity that is explicitly prohibited by the terms of the agreement. Moreover, the Court in Louisiana Smoked Products, supra, upheld a narrower noncompete agreement[6] between Savoie's, who manufactured and distributed various food products, and L.S.P., who marketed food products. Accordingly, we find that it is unnecessary for SEADRA and EZ Rent to perform precisely identical tasks in order to enforce the noncompete provisions of the License Agreement.
Therefore, under the particular facts and circumstances of this case, we find that La. R.S. 23:921 is inapplicable to the agreement executed between SEADRA and EZ Rent. We further find that SEADRA established a prima facie showing that it would likely prevail on the merits of the case and that it is entitled to the relief sought.[7] Accordingly, we find that the trial court committed legal error in failing to grant the injunctive relief requested and enforce the terms of the noncompete agreement that were negotiated between SEADRA and EZ Rent.[8]
Assignment of Error # 2
In its second assignment of error, SEADRA submits that the trial court erred in failing to address the provision of the noncompete agreement that prohibited EZ Rent from soliciting or attempting to solicit customers from SEADRA or SEADRA's licensees.
Specifically, SEADRA argues that prior to termination of the agreement, EZ Rent *99 maintained over three hundred customers. Thus, SEADRA submits that once the agreement ended and EZ Rent nonetheless continued to operate its business, its diversion of approximately three hundred customers to EZ Rent and "Rent T Own", EZ's new licensor,[9] plainly violated the non-solicitation provision of the agreement, paragraph 9.2(ii), supra. SEADRA further submits that EZ Rent is likewise attempting to divert SEADRA's customers with each new consumer contract that EZ Rent enters into subsequent to the termination of the agreement.
Conversely, EZ Rent submits that the non-solicitation clause is invalid for lack of a geographical limitation, pursuant to La. R.S. 23:921(C).[10] We note, however, that the paragraph immediately preceding the non-solicitation clause in the License Agreement designates Vernon Parish, Louisiana as the limits of the non-competition agreement within the subparts of Paragraph 9.2, under Section IX, entitled "Non-Competition," supra. Moreover, as previously noted, we find that, as in the Louisiana Smoked Products case, the mandates of La. R.S. 23:291 are inapplicable to the facts and circumstances of this particular case. Therefore, we find that EZ Rent's argument that the non-solicitation agreement fails for lack of a geographical restriction is without merit.
A review of the record reveals that SEADRA raised the argument that EZ Rent was in violation of the non-solicitation provision of the noncompete agreement at oral argument on February 5, 2007, but the February 7, 2007 judgment does not specifically address this particular issue. If a trial court's judgment is silent with respect to a claim or issue placed before the court, it is presumed that the court denied the relief requested. Loria v. Petunia's Restaurant, XXXX-XXXX, p. 3 (La. App. 4 Cir. 7/9/03), 852 So.2d 510, 513. For the aforementioned reasons, we find that the trial court committed legal error in denying SEADRA's request for injunctive relief with respect to the non-solicitation clause of the non-compete agreement.[11]
Assignment of Error # 3
In its third assignment of error, SEADRA submits that the trial court erred in failing to sustain or address its request for injunctive relief for protection of its trade secrets pursuant to La. R.S. *100 51:1432.[12] SEADRA argues that EZ Rent continued, after termination of the agreement, to use SEADRA's proprietary information, methods, software, procedures, and other trade secrets.[13] Furthermore, SEADRA submits that EZ Rent misappropriated[14] SEADRA's trade secrets when it transferred its customer data to Rent T Own and thus disseminated the information to a third party.
We find that SEADRA set forth sufficient evidence establishing that it was entitled to trade secret protection. The software, materials, and industry knowledge that SEADRA provided to EZ Rent meet the definition of "trade secret" under La. R.S. 51:1431(4). SEADRA's method and process of assisting and instructing businesses in the rent-to-own and rent-with-option-to-purchase industry has economic value, as EZ Rent agreed to pay SEADRA monthly fees in exchange for the information and has also profited from the benefit of this expertise. Moreover, SEADRA made considerable efforts to maintain secrecy of its methods through execution of the License Agreement, in which EZ Rent explicitly "acknowledge[d] that the methodology of marketing and operation of the SEADRA System is unique and distinctive and has been developed by SEADRA at great effort, time and expense." EZ Rent further acknowledged as part of the agreement that it had "regular and continuing access to valuable confidential *101 information and training regarding the SEADRA system . . ." Similarly, SEADRA has established that it is entitled to protection from misappropriation of its trade secrets, as EZ Rent is operating in conjunction with Rent T Own, SEADRA's competitor, who could potentially acquire SEADRA's trade secrets.
A review of the record in this case reveals that SEADRA asserted its trade secret claim in its petition for relief and in its oral argument to the court during the preliminary injunction hearing on February 5, 2007. The February 7, 2007 judgment, however, is void of any specific mention of SEADRA's trade secrets, although the judgment did order EZ Rent to "cease and desist use of SEADRA's tradename and service mark, return any and all of SE[A]DRA's proprietary materials and information and delete any and all of SE[A]DRA's proprietary materials and information from any and all of its computer systems." We find that the trial court's order denying the injunctive relief requested and then subsequently ordering EZ Rent to cease and desist its use of SEADRA's proprietary information to be inconsistent. As previously noted, if trial court's judgment on a claim or issue placed before the court is silent, it is presumed that the court denied the relief requested. Loria, XXXX-XXXX, p. 3, 852 So.2d at 513. Accordingly, to the extent that the trial court denied SEADRA's request for injunctive relief for trade secret protection, the judgment is reversed.
CONCLUSION
We are not inclined to invalidate the noncompetition agreement between two independent corporations on equal footing in this case. Like the Louisiana Smoked Products decision, however, our finding that La. R.S. 23:921 does not apply to the License Agreement executed by SEADRA and EZ Rent is strictly limited to the facts and circumstances of this particular case. The trial court's judgment denying the preliminary injunction is hereby reversed and SEADRA's request for injunctive relief is granted. The matter is remanded for further proceedings consistent with this opinion.
REVERSED, RENDERED AND REMANDED.
NOTES
[1] Like the instant case, Louisiana Smoked Products involved a noncompete agreement between two companies that produced and distributed sausage. In 1991, plaintiff Louisiana Smoked Products, Inc. ("L.S.P.") contracted to market smoked alligator and venison sausages that were manufactured by Savoie's Sausage and Food Products, Inc. ("Savoie's"). Louisiana Smoked Products, 96-1716, 696 So.2d at 1375. In exchange, L.S.P. agreed to process and purchase only through or from Savoie's. Id. Similar to the agreement in this case, the contract between the corporations in Louisiana Smoked Products contained a non-competition clause which provided that the parties would not compete against each other for three years after the agreement terminated. Id.

In 1993, after the parties mutually terminated the contract, Savoie's continued to use L.S.P.'s recipes for the smoked alligator and venison sausages, manufacturing and selling it under its own label. Id. L.S.P. subsequently sued Savoie to enforce the noncompete provisions of the agreement. Id. The Louisiana Supreme Court found that the noncompete clause was a valid bargain between two corporations on equal footing and thus upheld the agreement, affirming the award of damages in favor of L.S.P. and against Savoie's in the amount of $53,772.53. Id. at 1380-81.
[2] The Court noted that Sections (B) through (F) of the statute are exceptions to provision (A):

The exceptions to this provision are specific and enumerated in Sections (B) through (F) of the statute. The exceptions include an employer/employee relationship, a partnership/partner relationship, a corporation/shareholder relationship, or a franchise/franchisee relationship. See La. R.S. 23:921(B) through (E). In each of these situations, the statute provides for limited circumstances under which a noncompetition clause may be valid. Id. Further, in Section (F), the statute provides for an exception pertaining to computer programming. See La. R.S. 23:921(F). As none of the exceptions apply to a business relationship between two corporations, which is the nature of the relationship between the parties in the instant case, the court must determine whether the legislature intended to prohibit noncompetition clauses executed by two businesses with its enactment of the 1989 amendment to La. R.S. 23:921.
Louisiana Smoked Products, 696 So.2d at 1378 (emphasis added). Section (G) relates to agreements between employers and employees regarding confidential computer programs, and Section (I) relates to agreements between automobile salespersons and their employers. See La. R.S. 23:921(G), La. R.S. 23:921(I). La R.S. 23:921(H) provides:
Any agreement covered by Subsections B, C, E, F, or G of this Section shall be considered an obligation not to do, and failure to perform may entitle the obligee to recover damages for the loss sustained and the profit of which he has been deprived. In addition, upon proof of the obligor's failure to perform, and without the necessity of proving irreparable injury, a court of competent jurisdiction shall order injunctive relief enforcing the terms of the agreement.
[3] The Court further explained:

The 1989 amendment's drafters explained in legislative committee hearings that the amendment was needed to rectify the courts' flawed interpretation of La. R.S. 23:921 and to restore the legislature's original intent to the statute. [Jeff D. Morgan, Comment, If At First You Don't Succeed: Louisiana's Latest Statutory Enactment Governing Agreements Not to Compete, 66 Tul. L.Rev. 551] note 44, at 559. La. R.S. 23:921 was enacted amidst the trials of the Great Depression in 1934. Morgan, supra notes 12 and 13, at 559. The legislature's original intent for the enactment of La. R.S. 23:921 was to establish a public policy which would forbid the exclusion of individuals from the fields of work for which they were perhaps best suited at a time when the nation's economy was floundering and could not accommodate the vast numbers of workers in the work force. Morgan, supra note 13, at 554. Consequently, La. R.S. 23:921, as it was drafted in 1934, declared null and unenforceable any provision in which an employee agreed not to compete with his employer following the termination of his employment. Id. Louisiana has consistently had a strong public policy against any employment contract which prohibits an employee from competing with a former employer. Neeb-Kearney and Co., Inc. v. Rellstab, 593 So.2d 741 (La.App. 4 Cir. 1992), citing Orkin Exterminating Company v. Foti, 302 So.2d 593 (La.1974) and Matter of Standard Coffee Service Company, 499 So.2d 1314 (La.App. 4 Cir. 1986), writ denied, 501 So.2d 232 (La.1987). Moreover, the public policy of Louisiana, both prior to 1934 and later, as expressed in La. R.S. 23:921, has always been to prohibit (or severely restrict) noncompetition agreements between employers and employees. Sentilles v. Kwik-Kopy Corporation, 652 So.2d 79 (La.App. 4 Cir. 1995), rehearing denied.
Louisiana Smoked Products, 696 So.2d at 1379(emphasis added).
[4] The Court was referring to La. R.S. 23:921(C), which provides that noncompetition agreements between employees and employers are valid under limited circumstances:

Any person, including a corporation and the individual shareholders of such corporation, who is employed as an agent, servant, or employee may agree with his employer to refrain from carrying on or engaging in a business similar to that of the employer and/or from soliciting customers of the employer within a specified parish or parishes, municipality or municipalities, or parts thereof, so long as the employer carries on a like business therein, not to exceed a period of two years from termination of employment. An independent contractor, whose work is performed pursuant to a written contract, may enter into an agreement to refrain from carrying on or engaging in a business similar to the business of the person with whom the independent contractor has contracted, on the same basis as if the independent contractor were an employee, for a period not to exceed two years from the date of the last work performed under the written contract.
La. R.S. 23:921(C).
[5] We note that the facts of the instant case are plainly distinguishable from Times-Picayune Publishing Corp. v. New Orleans Publishing Group, Inc., XXXX-XXXX (La.App. 4 Cir. 3/20/02), 814 So.2d 34. In Times-Picayune, this Court recognized Louisiana Smoked Products' holding that with respect to the weighing of interests between the freedom of contract and the freedom to compete, that the Louisiana Supreme Court had found "in favor of freedom to contract where corporations of equal bargaining power are involved." Times-Picayune, XXXX-XXXX p. 5, 814 So.2d at 37-38. At issue in Times-Picayune, however, was an Asset Purchase Agreement and Bill of Sale whereby the Times-Picayune Publishing Corporation ("Times-Picayune") acquired assets and rights from the New Orleans Publishing Group, Inc. ("NOPG"), and part of the Asset Purchase Agreement included a non-competition clause which curtailed competition for the legal notices business. Id. at 36. This Court found that, unlike the facts in Louisiana Smoked Products, "the business that is the subject of this litigation, the publication of legal notices, is a matter affected with the public interest." Id. at 37. Accordingly, this Court explicitly distinguished the policy considerations in Times-Picayune from those in Louisiana Smoked Products, holding that "in the instant case there is a third party, unnamed in the Asset Purchase Agreement and the Bill of Sale, whose interests are affected by those documents-the general public." Id. at 38.
[6] The noncompete clause at issue in Louisiana Smoked Products provided that "[e]ach party agrees and obligates itself not to engage in activity which directly competes with the other party's business activity for a period of three (3) years after the termination of this Agreement," in contrast to the "directly or indirectly" language in the noncompete agreement in the instant case.
[7] As previously noted, pursuant to Section XI, Remedies Upon an Event of Default, Paragraph 11.2 of the License Agreement executed between SEADRA and EZ Rent, the parties "acknowledge[ed] that irreparable injury will be suffered by SEADRA in the event of any breach of this Agreement by [EZ Rent]". EZ Rent does not dispute that SEADRA does not have to demonstrate irreparable harm to obtain injunctive relief.
[8] While not binding on this Court, we find the Orleans Parish trial court's judgment South East Auto Dealers Rental Association, Inc. v. Vidalia Auto & Glass, LLC, 07-7961, signed August 16, 2007, noteworthy. In Vidalia, SEADRA filed a request for injunctive relief against Vidalia Auto & Glass, LLC ("Vidalia"), asserting that it was competing and soliciting SEADRA and SEADRA's licensee's customers in Concordia Parish in violation of a noncompete provision in the License Agreement between the parties. SEADRA also asserted that Vidalia misappropriated its trade secrets, including customer data, customer lists, and consumer contracts. Conversely, Vidalia argued that the noncompete provision was unenforceable and that Vidalia did not directly compete with SEADRA.

In its Reasons for Judgment, the trial court considered whether SEADRA was engaged in a similar business to Vidalia. After examining the language contained in the License Agreement, the court found that Vidalia competed with SEADRA by performing services similar to those of SEADRA in the rent-to-own or rent-with-option-to-purchase business in conjunction with a SEADRA competitor in Concordina Parish, and that Vidalia had thus violated the agreement. Accordingly, the trial court granted SEADRA's request for injunctive relief, explicitly relying on Louisiana Smoke Prods., Inc. v. Savoie's Sausage and Food Prods.[,] Inc., (La.7/7/97), 696 So.2d 1373. The court further rejected jurisprudence cited by Vidalia that involved employer-employee relationships, noting that "[t]he instant matter concerns independent contractors on equal footing."
[9] SEADRA maintains that EZ Rent has transferred lessees to the "Rent T Own" system, a competitor of SEADRA that operates a similar rent-with-option-to-purchase program.
[10] Any person, including a corporation and the individual shareholders of such corporation, who is employed as an agent, servant, or employee may agree with his employer to refrain from carrying on or engaging in a business similar to that of the employer and/or from soliciting customers of the employer within a specified parish or parishes, municipality or municipalities, or parts thereof, so long as the employer carries on a like business therein, not to exceed a period of two years from termination of employment. . . .

La. R.S. 23:291(C).
[11] EZ Rent also argues that the non-solicitation agreement is void because La. R.S. 23:291(C) provides that "[a]n independent contractor, whose work is performed pursuant to a written contract, may enter into an agreement to refrain from carrying on or engaging in a business similar to the business of the person with whom the independent contractor has contracted . . ." (emphasis added). While SEADRA and EZ Rent are identified as independent contractors in the License Agreement, EZ Rent maintains that the noncompete provision is nonetheless void because EZ Rent did not perform any work pursuant to a written contract. Because we find that La. R.S. 23:291 is inapplicable to the facts and circumstances of the instant case, we pretermit consideration of this argument.
[12] La. R.S. 51:1432 of the Louisiana Uniform Trade Secrets Act ("LUTSA") provides:

A. Actual or threatened misappropriation may be enjoined. Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.
B. If the court determines that it would be unreasonable to prohibit future use, an injunction may condition future use upon payment of a reasonable royalty for no longer than the period of time the use could have been prohibited.
C. In appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order.
[13] Trade Secret is defined under the statute as:

. . . information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
(a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and
(b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
La. R.S. 51:1431(4)(a) and (b)(emphasis added).
[14] Misappropriation is defined under the statute as:

. . . acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(b) disclosure or use of a trade secret of another without express or implied consent by a person who:
(i) used improper means to acquire knowledge of the trade secret; or
(ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
(aa) derived from or through a person who had utilized improper means to acquire it;
(bb) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
(cc) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
(iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.
La. R.S. 51:1431(2)(a) and (b).